OPINION OF THE COURT
F. Warren Travers, J.
Petitioners commenced this CPLR article 78 proceeding to obtain an order declaring a regulation of respondent Commissioner of Health (hereinafter COH) invalid and to enjoin its enforcement. Petitioners also seek an order directing the promulgation of a new regulation. The regulation being challenged is found at 10 NYCRR 86-1.60 (b) and is the regulation which provides the methodology implementing Public Health Law § 2807-c (11) (f).
The law and regulation provide part of the method by which hospitals throughout the State are reimbursed for care provided to non-Medicare patients. The regulation in question deals with limitations on changes in case mix and its fiscal impact.
The petitioners claim that the promulgation of section 86-1.60 was arbitrary, capricious, an abuse of discretion and not in accordance with applicable law. In particular, petitioners contend that the imposition of a flat real case mix penalty against all general hospitals is not permitted by Public Health Law § 2807-c (11) (f); that the regulation effectively denies a right to appeal mandated by Public Health Law § 2807-c (11) (f) (i); that the regulation results in reimbursement rates that fail to provide funds that are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities; that the COH’s calculation of the average State-wide increase in case mix is flawed; that the July 1990 amendment to section 86-1.60 applying the new methodology retroactively is improper.
The respondent contends that the regulation as implemented included a consideration of appropriate factors and is reasonable, rationally based, and in accordance with all applicable law.
Motions to intervene were brought before other Justices. The record before this Justice does not contain any orders granting intervention. The court assumes such status has been *449 granted. No opposition to such intervention is in the papers before the court. If by oversight, no order was signed or decision made, the court hereby grants, without opposition, the motions for intervention.
The intervenors take the position that the regulation was properly adopted and is reasonable and rationally based. Intervenors further contend that the methodology established by the regulation takes into consideration all the factors required to be considered by the Public Health Law.
Extensive submissions by all parties provide background material necessary to understand the complex method by which hospitals receive payment for services.
This case involves a legislatively imposed limitation on the amount of reimbursement by the State and other third-party payors to general hospitals. The regulation provides the methodology by which each hospital’s share of available funds is calculated.
In order to understand the legal issues presented, it is necessary to understand the meaning of many of the phrases contained in the law and regulation.
The hospital case mix refers to a profile of the severity of illnesses and necessary treatment received by all patients served by an individual hospital. To obtain this profile, each patient is placed in a diagnosis-related group (DRG). The more severe the illness, the higher the DRG number that is assigned. A recognized coding system has been adopted so that there is uniformity in assignment of DRG codes. Hospitals are reimbursed a specific amount for each patient based upon the DRG assigned. The number of days in the hospital and actual services received are not considered. The payment system is not designed specifically to reimburse for the actual costs incurred for each individual patient. Rather, the hospital is paid a flat amount that depends upon the DRG coding. The purpose of this payment system is to encourage each hospital to treat each patient in the most economical manner and to discourage unnecessary procedures and hospital stays.
As part of this new prospective payment system, Public Health Law § 2807-c was adopted. The Legislature recognized that in changing from a system that reimbursed for actual costs incurred to a prospective payment system, improvement in documentation of patient illness was likely to occur. Accuracy in DRG coding was not as important in a cost reimbursement system. When payment is based upon the DRG code, it *450 is to each hospital’s financial advantage to make sure that each patient was placed in as high a DRG code as possible, yet proper. The higher the code, the higher the amount of reimbursement. This improvement in coding practices (without any change in actual services received by the patient) resulting in higher reimbursement rates is known as "creep”.
Real changes in case mix are defined as actual increases in the types of services delivered rather than paper enhancements (creep). These changes in case mix may be caused by simply treating sicker people or by changes in the services offered by the hospital. A new greater resource intensive service may result in treatment of illnesses not previously served. The elimination of high DRG services may decrease the case mix. The methodology seeks to separate real changes in case mix from improvements in coding practices (creep).
The Legislature imposed a cap or ceiling on the amount of real increases in case mix that would be allowed from year to year on a State-wide basis. A financial penalty is imposed if the State-wide cap on increases in case mix is exceeded. How that penalty is imposed in actual dollars upon each hospital is part of the substance of the regulation. Also included is the method by which it is determined whether the case mix cap has been exceeded or not.
Public Health Law § 2807-c (11) (f) (i), enacted January 1988, provides in pertinent part: "In order to allow for real increases in general hospital case mix while limiting the effect of potential case mix changes that are the result of changes in coding practices rather than real changes in case mix, the commissioner shall annually * * * adjust individual general hospitals’ case payment rates * * * to account for increases in the statewide average case mix, based on increases in statewide average assignment to diagnosis-related groups * * * that exceed the allowable statewide increase determined in accordance with this subparagraph. * * * If in any rate year the cumulative case mix increase exceeds the allowable statewide increase, rates of payment to general hospitals shall be adjusted in accordance with rules and regulations * * * which shall contain the specific methodology to allocate the reduction among general hospitals, in order to reduce the effect of the statewide increase on rates of payment to reflect the allowable increase. Such methodology shall take into account past trends of individual general hospitals’ case mix changes, and, within the aggregate allowable statewide increase in case mix, permit general hospitals to appeal to the commissioner *451 their proposed allocation of a reduction in rates of payment related to increases in statewide average case mix based on such factors as changes in hospital service delivery and referral patterns. Case mix changes due to acquired immune deficiency syndrome, epidemics or other catastrophes resulting in extraordinary hospital utilization shall not be subject to this limitation.”
In accordance with this statutory mandate, the respondent Commissioner promulgated 10 NYCRR 86-1.60 effective January 1, 1988, amended it in January of 1990 (and added § 86-1.75) and amended it again in July of 1990. As promulgated, section 86-1.60 did not state the methodology to be utilized in determining whether the case mix cap had been exceeded in the relevant rate year, nor did it include the methodology for assessing the case mix penalty, if necessary, against individual general hospitals.
On January 24, 1990, section 86-1.60 was amended (the January Amendment) and a new section 86-1.75 was added. The January Amendment, when read in conjunction with new section 86-1.75, provided the specific methodology for determining the increase in both components of case mix, i.e., creep increases relating to coding enhancements and real increases relating to actual increases in service delivery.
The methodology employed in the January Amendment to section 86-1.60 authorized the Commissioner to assess the real component of the case mix penalty against all general hospitals, irrespective of whether the individual general hospital had exceeded the case mix cap in the relevant rate year — but the magnitude of the penalty was directly related to the individual general hospital’s actual experience. The individual real case mix penalty was determined by multiplying the increase in the State-wide average case mix increase over the statutory cap, i.e., .63% for 1988 and 1.01% for 1989, by the individual general hospital’s total increase in real case mix. Once this individual real case mix penalty was determined, each DRG payment for that general hospital (excluding Medicare) was reduced by the amount of the penalty.
After issuing the January 1, 1990 revised rates, the Commissioner received complaints from individual general hospitals pertaining to the methodology used to determine the real component of the case mix penalty. As a result, the Commissioner proposed a second amendment to section 86-1.60 (b), which was adopted on an "emergency” basis (the July Amendment).
*452 The July Amendment significantly changes the fiscal impact upon individual hospitals.
Instead of assessing the real component of the case mix penalty based on the case mix experience of the individual general hospital, the July Amendment financially penalizes all general hospitals by reducing non-Medicare in-patient revenues by the flat percentage that the State-wide average real case mix exceeds the statutory case mix cap in the relevant rate year.
Under the July Amendment to section 86-1.60, each general hospital was assessed a flat real case mix penalty of .63% (the amount by which the State-wide increase in case mix exceeded the statutory cap) against all in-patient hospital revenues (excluding Medicare) for rate year 1988 and 1.01% for rate year 1989, irrespective of the general hospital’s actual real increase or decrease in case mix.
Pertaining to judicial review of administrative rules, Judge Bellacosa, writing for the majority in New York State Assn. of Counties v Axelrod (78 NY2d 158, 166-167), stated, "[A]n administrative regulation will be upheld only if it has a rational basis, and is not unreasonable, arbitrary or capricious (Matter of Bates v Toia, 45 NY2d 460, 464; Matter of Bernstein v Toia, 43 NY2d 437, 448; Ostrer v Schenck, 41 NY2d 782, 786). Administrative rules are not judicially reviewed pro forma in a vacuum, but are scrutinized for genuine reasonableness and rationality in the specific context (Matter of Bates v Toia, supra, at 464). The challenger must establish that a regulation 'is so lacking in reason for its promulgation that it is essentially arbitrary.’ (Matter of Marburg v Cole, 286 NY 202, 212; see, Molina v Games Mgt. Servs., 58 NY2d 523, 529; Matter of Bates v Toia, supra, at 464; Matter of Bernstein v Toia, supra, at 448; Ostrer v Schenck, supra, at 786.) DOH’s rate-setting action may be declared null and void ' "upon a compelling showing that the calculations from which [it is] derived [are] unreasonable” ’ (Matter of Society of N. Y. Hosp. v Axelrod, 70 NY2d 467, 473; Matter of Catholic Med. Center v Department of Health, 48 NY2d 967, 968; Matter of Sigety v Ingraham, 29 NY2d 110, 114).”
The court must review the record to determine if there is a rational basis for the regulation. Included within the basis for the regulation, the record must disclose, at the very least, those factors which the Legislature expressly stated must be considered in Public Health Law § 2807-c (11) (f). By law, the *453 methodology shall take into account past trends of case mix changes of individual general hospitals, as well as changes in hospital service delivery and referral patterns.
The process by which the COH promulgated the regulation in question is detailed in an affidavit of the Assistant Director, Division of Health Care Financing, Office of Health Systems Management, New York State Department of Health submitted to the court. The affidavit recites some background information useful in understanding the process. For the most part, the affidavit is conclusory in nature. The affidavit fails to recite any empirical documentation, assessment and evaluation that the COH undertook prior to issuance of the regulation. The affidavit states the conclusion that certain hospitals would be "unduly penalized under the January Amendment for treating more resource intensive patients”. The further conclusion is made that this "would be unjust” and that all hospitals should be treated equally when it comes to applying the case mix cap. Further, statements are included explaining the impact of the regulation including the January and July Amendments. Little, if any, documentation is provided to show how the regulation itself came into being. Most of the affidavit pertains to the impact of the regulation and not to the basis upon which its language was determined.
A large portion of the record submitted in opposition to the petition by the respondent and interveners addresses conflicting interpretations of the Public Health Law. The issue which concerns this court is the basis upon which the regulation was formulated, that is, whether there is a rational basis for the regulation.
The record fails to establish any rational basis for promulgation of the regulation.
The most convincing evidence of this lack of any rational basis is contained in paragraph 29 of the Assistant Director’s affidavit which states as follows: "29. Following the January 1990 promulgation of 10 NYCRR § 86-1.60 the Department received numerous complaints from hospitals regarding the methodology for allocating the reduction of real case mix increase. The Department was contacted by HANYS’ representatives, Mr. Makofske and Ju-Ming Chang, who proposed alternative methodologies including a new method that effectively was the same as the January methodology except for the allocation of the adjustment to 'real’ case mix. As HA-NYS’ proposal was an equitable one, which addressed certain *454 inequities in the January methodology, the Department chose to utilize it to adjust the methodology.”
Rather than devise its own regulation, the COH abdicated his rule-making function. Within six months of the effective date of the regulation, the COH adopted the amendment suggested by Hospital Association of New York State (HA-NYS).
As the Court of Appeals said recently in New York State Assn. of Counties v Axelrod (supra, at 168), "While discourse with the affected industry is surely appropriate, it is no substitute for DOH’s obligation to promulgate reasonable and rational regulations.” Here the DOH simply adopted HANYS’ proposal without any documentation, assessment or evaluation of its own.
The petitioners submit evidence to establish that total hospital discharges actually declined in New York State after the base year. This is not disputed by the respondent or interveners. The reasons given for the decline may vary but a substantial portion of the decline appears to be attributed to the shift of many medical procedures from an in-patient status to an ambulatory surgery status. Not only has this affected the total hospital admissions, but has also caused a shift in the hospitals’ case mix. Many low level DRG codes are now not included in the case mix profile. If there were no other influencing factors, this alone would cause an increase in the case mix profile when in reality there was no change except for the elimination of some low level DRG codes.
The trend in case mix changes is a factor the Legislature has expressly stated must be included in the methodology adopted. There is no proof in the record to show that this factor was considered by the COH. The record does establish that the Legislature was very aware of this factor. An amendment to the law was adopted which increased the State-wide case mix cap limitation from 1% to 2%. There is no proof in the record to establish that the COH considered this trend factor separately from the legislative action when it adopted the regulation.
The courts have invalidated regulations when the record contained no evidence to support the regulation (see, Matter of Jewish Mem. Hosp. v Whalen, 47 NY2d 331, and Matter of Hawley v Cuomo, 46 NY2d 990). Such is the case before this court. The record contains entirely conclusory statements to justify the adoption of the regulation. The record is devoid of any evidence to support such conclusions.
*455 The court concludes that 10 NYCRR 86-1.60 (b) must be annulled as lacking a rational basis. The matter is remanded to the COH for promulgation of a new regulation consistent with statutory requirements. Because the court concludes that the regulation itself must be annulled, the remaining issues of appealability, retroactivity, and imposition of a flat case mix penalty need not be addressed. Presumably, any new regulation will appropriately consider these issues.
The petition requests attorneys’ fees pursuant to the New York Equal Access to Justice Act. (CPLR 8600 et seq.) Pursuant to CPLR 8601 (b), any determination of such request is presently premature.