OPINION OF THE COURT
Helen E. Freedman, J.
Faced with imminent eviction for nonpayment of rent from long-term or otherwise desirable residences, Jannett Doyley and several petitioners-plaintiffs interveners (collectively, *653 plaintiffs) applied for Emergency Home Relief (EHR) grants to pay the arrears and retain their homes. The applications were denied on the ground that their individual or family income exceeded 125% of the Federal income poverty line, a ceiling prescribed by a recent amendment to the regulations governing the EHR program.[1] The amendment at issue was first adopted as an emergency regulation and then on a permanent basis by the New York State Department of Social Services (DSS), which administers the EHR program. Defendant-respondent (defendant) was acting Commissioner of DSS.
Plaintiffs seek: (1) to have the amendment declared invalid on the grounds that it is irrational and unconstitutional, and that, as an emergency regulation, it was illegally promulgated; and (2) an order vacating the administrative decisions in which DSS enforced the amendment and remanding plaintiffs’ grant applications for further evaluation of eligibility. Plaintiffs also move (1) for class certification for themselves and others similarly affected by the challenged amendment and (2) to join the Commissioner of the New York City Human Resources Administration (HRA) in her official capacity to ensure effectuation of any relief ordered hereby. Defendant opposes all relief sought by plaintiffs (except joinder of HRA’s Commissioner).
In order to understand the bases of the claims, a brief summary of the legislative history of the challenged amendment is warranted.
STATUTORY AND REGULATORY HISTORY
The EHR program (18 NYCRR 370.3), created under the rule-making power of DSS, is a last resort for certain New York State residents with emergency needs who are ineligible for assistance under any other State program. Under EHR, one-time emergency assistance payments are available to people facing eviction for nonpayment of rent[2] who are ineligible for assistance under the criteria of the Federal program of Emergency Assistance to Needy Families with Children (EAF) (42 USC § 606 [e]; Social Services Law § 350-j; 18 NYCRR part 372), or under Emergency Assistance for Adults (EAA) (Social Services Law §§ 300-309; 18 NYCRR part 397). EAF grants are *654 given only to families with minor dependent children and are limited to "unforeseeable” and unpreventable emergency events, such as a fire or flood. (Social Services Law § 350-j.) EAA grants are limited to disabled or elderly persons and those poor enough to qualify for Supplemental Security Income. (18 NYCRR 397.1 [a].)
Prior to July 19, 1991, the regulation setting forth eligibility for EHR (18 NYCRR 370.3 [b]) provided in part as follows:
"(b) Eligibility for emergency home relief Social services districts must authorize emergency home relief only under the following conditions:
"(1) there is an identified emergency need. An emergency is a serious occurrence or situation needing prompt action;
"(2) the individual or family is without income or resources immediately available to meet the emergency need;
"(3) the emergency need cannot be met under the Emergency Assistance to Needy Families with Children, the Home Energy Assistance Program, Aid to Families with Dependent Children or Home Relief Programs”.
As part of the legislation enacting the 1991 New York State budget, the Legislature authorized defendant "to promulgate on an emergency basis regulations necessary to accomplish the following cost containment objectives * * * consolidation or reduction of special needs allowances” (L 1991, ch 53 [aid to localities budget]).
On July 19, 1991, defendant, claiming authority under that legislative provision (the Budget Provision), amended 18 NYCRR 370.3 (b) (2) by emergency rule to provide: "(2) the individual or family is without income or resources immediately available to meet the emergency need; and the individual’s or family’s gross income does not exceed 125 percent of the current federal income official poverty line (as defined and annually revised by the federal office of management and budget). If the emergency is the result of a fire, flood or other like catastrophe * * * the individual’s or family’s gross income can exceed 125 percent of the federal income official poverty line” (NYS Register, Aug. 7, 1991, at 33).[3] DSS’s notice *655 of the emergency adoption of the amendment (as so adopted, the Emergency Amendment) failed to include a statement describing the reasons necessitating such emergency adoption, as required by State Administrative Procedure Act § 202 (6) (d) (iv), but provided that it was "intended to serve as both a notice of emergency adoption and a notice of proposed rule making”. (Id., at 34.) On December 24, 1991, the defendant adopted the amendment as final (as so adopted, the Amendment).[4]
DECLARATORY AND INJUNCTIVE RELIEF
I
Plaintiffs challenge the validity of the Amendment on the grounds that it is arbitrary and irrational, and that it violates article XVII, § 1 of the New York State Constitution, which mandates that the State shall provide for the aid, care and support of the needy. They also contend that the manner in which the Emergency Amendment was promulgated violated both substantive and procedural law.
Plaintiff’s contention that the Amendment’s bright-line income test for EHR eligibility is arbitrary and irrational because it lacks any evidentiary foundation is compelling. A monetary guideline established by regulation must bear some rational relationship to the goals sought to be achieved, and must otherwise be factually based. (Matter of Jewish Mem. Hosp. v Whalen, 47 NY2d 331, 343 [1979]; New York Assn. of Homes & Servs. for Aging v Perales, Sup Ct, Albany County, June 21, 1991, No. 91-918, slip opn, at 3-5.) Jewish Mem. invalidated a Department of Health regulation which eliminated 10% of the salary costs attributed to residents and interns from hospital reimbursement rates, because the agency deemed that percentage to be unrelated to patient services. The Court reasoned that there was no evidentiary basis in the record for the determination that 10% was the proper figure to be excluded; defendant conceded that no study *656 had been conducted in arriving at that figure. (Supra, at 343.) In New York Assn., a DSS regulation that nursing homes were to be paid only 85% of the normal reimbursement rate for a bed reserved for a Medicaid patient during that patient’s absence was struck down: the court found that defendant had arrived at the 15% figure "as the result of an estimate made without any analysis, report or study.” (Slip opn, at 5.)
In this case, defendant has adopted a monetary guideline capping eligibility for EHR at 125% of the Federal poverty level. As a result, applicants who might otherwise be eligible for EHR, are barred from relief if their incomes exceed the ceiling by merely a few dollars. As justification for imposing such a rigid test, defendant proffers the affidavit of Barbara Wellman, Director of the Bureau of Income Support programs in DSS’s Division of Income Maintenance. Wellman states that, in response to budget cuts in DSS’s income maintenance programs and pursuant to the Budget Provision, she and other DSS employees "discussed manners in which the cost containment measures could be carried out with the least impact on the neediest part of the population within the State.” Defendant set the threshold for EHR eligibility at 125% of the poverty level because: "families or individuals with incomes above [125 percent of the federal poverty level] should be able to plan for emergencies * * * DSS determined that a family whose income is over 125 percent of the poverty level should have been able to plan their budget in the first instance to avoid the emergency at all. Thus, [the Amendment] attempts to limit assistance to those who should have been able to pay their rent, but used their income for other things * * * DSS determined that setting the income restriction at the poverty level did not provide a sufficient safety net, but that once income reached 125 percent of the poverty level, families would have sufficient income to plan for emergencies.”
However, defendant has offered no evidentiary basis for its determination that the Amendment’s bright-line test reasonably distinguishes those EHR applicants who could have prepared for emergencies from those who could not. The record contains no study, analysis or report used to arrive at 125% of the poverty level as an appropriate guideline.[5] Moreover, no such materials were obtained by plaintiffs from defendant in *657 response to a Freedom of Information Law (FOIL) request for all documents concerning the Amendment; nor was any privilege asserted in fulfilling the FOIL request.
In short, DSS’s determination that its monetary guideline meaningfully distinguishes between worthy and unworthy EHR applicants is no more than unsubstantiated theory. Lacking any empirical basis, the determination is impermissibly arbitrary. (See, New York State Assn. of Counties v Axelrod, 78 NY2d 158, 168 [1991]), in which the Court struck down a Department of Health Medicaid reimbursement schedule because it was "not based on a rational, documented empirical determination.”
In addition to the absence of any factual underpinning, defendant’s theory that EHR applicants with incomes exceeding the guideline should have been able to pay arrears and other emergency needs is irrational on its face. Under the Amendment, EHR applicants who fall behind in their rent payments while their incomes are below the guideline, but who apply for EHR after their incomes rise above the ceiling, are ineligible for relief. In other words, a formerly destitute and unemployed individual, facing eviction for rent arrears incurred during a time of economic difficulty, would be denied aid once his or her income rose above the guideline, on the ground that, while destitute, he or she "should” not have incurred the arrears. This is patently absurd as theory, and in practice amounts to arbitrary punishment for individuals like Ms. Doyley, who have struggled to achieve economic independence. They should not be penalized by losing their homes.
Ms. Doyley’s case is representative of the Amendment’s inequities. Now working 55 hours per week to make ends meet, she clearly cannot pay arrearages incurred while she was unemployed and after her husband abandoned her. However, because she is able to pay current rent, defendant denies her arrearage payments, forcing her to leave her home and causing her tremendous disruption and upheaval. It is unlikely that Ms. Doyley will be able to find other affordable and otherwise satisfactory housing in her present neighborhood. The cost of relocating to new quarters, including security deposit obligations, might well exceed arrearage payments and create new hardship for Ms. Doyley.
This court recognizes the importance of deferring to an administrative agency’s rule-making determinations. (Matter of Harbolie v Berger, 43 NY2d 102, 109 [1977].) The court also *658 acknowledges that the Legislature has mandated that defendant take steps to contain the costs of its programs,[6] and that wide discretion is accorded to administrative decisions. (See, Matter of Lorie C., 49 NY2d 161, 171 [1980].) However, that discretion must be exercised in a rational manner. A regulation like the Amendment, which both lacks any rational basis and is unreasonable on its face, is subject to judicial review. (New York State Assn. of Counties v Axelrod, supra, 78 NY2d, at 166.) Accordingly, the Amendment is invalidated and its enforcement is enjoined.
II
Plaintiffs contend that the Amendment violates article XVII, § 1 of the State Constitution, which provides that "[t]he aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine.” Defendant argues that those who would be eligible for EHR but for the Amendment’s provisions are not "needy”, because the Legislature has not designated them as such. Under the well-settled rule that constitutional questions will not be decided unless it is clearly necessary, the court need not reach that issue. (Matter of Peters v New York City Hous. Auth., 307 NY 519, 527-528 [1954].)
Plaintiffs also challenge the validity of the Emergency Regulation on the grounds that: (1) the Budget Provision violated article VII, § 6 of the State Constitution, which restricts the content of budget bills to items relating to specific appropriations in the bill; (2) the Budget Provision unconstitutionally delegated budget-making power to defendant in violation of the separation of powers doctrine; (3) the Budget *659 Provision did not authorize the Emergency Regulation; and (4) the manner in which defendant adopted the Emergency Regulation violated the State Administrative Procedure Act.
Defendant concedes that he failed to comply with the notice provisions set forth in State Administrative Procedure Act §202 (6) (d) (iv), but contends that the Budget Provision overrode said requirement. Such argument lacks any basis whatever. However, it is undisputed that DSS complied with the relevant State Administrative Procedure Act notice requirements prior to its adoption of the Amendment, which superseded the Emergency Regulation. Issues as to the constitutionality of the Budget Provision and the authority for the Emergency Regulation need not be reached here, inasmuch as the Emergency Regulation was invalidly promulgated.
CLASS ACTION CERTIFICATION
Plaintiffs have moved to certify a class consisting of "[a]ll New York City applicants for Emergency Home Relief with gross income in excess of 125% of the federal poverty income guideline whose applications were or will be denied on or after July 19, 1991, pursuant to the amendment to 18 NYCRR § 370.3 (b) (2) sought to be enjoyed”.
In the past this court has favored granting class action certification in matters involving governmental authorities. (Matter of Lamboy v Gross, 129 Misc 2d 564, 570-574 [Sup Ct, NY County 1985], affd 126 AD2d 265 [1st Dept 1987].) However, this court is also aware of the reluctance demonstrated by the appellate court in this Department to grant class action status to individuals challenging actions of governmental officials on the ground that certification was superfluous. In Jiggets v Grinker (148 AD2d 1 [1st Dept 1989], revd on other grounds 75 NY2d 411 [1990]) the First Department reversed class certification by the lower court based on stare decisis principles and the assumption that appropriate regulations would be issued to correct deficiencies. Similarly, in Matter of Fulton v Krauskopf (117 AD2d 198, 221 [1st Dept 1986]), class certification was reversed because the record did not establish unwillingness on the part of respondent government official to comply with and apply court rulings equally to persons similarly situated. In view of these recent rulings, the court will hold the issue of class certification in abeyance pending submission to the court of a plan for compliance with this order by defendant. The plan should include proper notification of *660 all DSS and HRA offices, and should demonstrate that certification is not necessary. The court also will hold in abeyance determination of plaintiffs’ motion to join the Commissioner of HRA, pending defendant’s submission of a plan for compliance.
Both sides are directed to submit a proposed order and judgment reflecting the above decision on or before August 14, 1992. The proposals should contain a plan for notification of the appropriate government offices.

. Since this action was commenced, plaintiff Donna Kelly has received an EHR grant after a change in her economic circumstances.

. EHR grants are available for other purposes, including replacement costs for furniture or clothing, funeral expenses and camp fees.

. Defendant also amended 18 NYCRR 370.3 (b) by adding a new paragraph (5), which provides that an applicant for shelter arrears must demonstrate an ability to pay future shelter expenses, and that shelter arrears need not be paid to maintain specific housing if the applicant has sufficient resources to secure and maintain alternate housing. Plaintiffs do not challenge the validity of this clause.

. On April 2, 1992, the Governor signed into law Social Services Law § 131-w, which, among other things, expressly limits rent arrears, property taxes or mortgage arrears payments for persons ineligible for public assistance programs other than EHR: the applicant’s household income cannot exceed 125% of the Federal income poverty line. In effect, section 131-w codifies the Amendment. Plaintiffs characterize section 131-w as "unconstitutional” in their papers. However, the lawfulness of the new statute is not before this court and shall not be addressed here.

. Indeed, the only documentation analyzing the guideline which defendant submitted, upon request of the court, was the comment by the New York City Human Resources Administration (HRA) that the 125% figure was too low "to meet the goal of providing EHR to people who are in need.”

. However, plaintiffs’ policy arguments with respect to the Amendment’s adverse effects merit consideration. First, plaintiffs argue that defendant’s adoption of the Amendment may have been short-sighted and "penny wise and pound foolish”, because the cost of sheltering unsuccessful EHR applicants made homeless after eviction would far exceed the money saved by denying them one-time grants. Second, the social costs and individual hardships, especially for children, that might result from individuals and families being forced into homelessness as a result of the Amendment are grave. The court is particularly aware of the special vulnerability of homeless families. (See, McCain v Koch, 117 AD2d 198, 211-216 [1st Dept 1986].) The children of Ms. Doyley are representative of a group for whom the Amendment could have disastrous consequences.