OPINION OF THE COURT
Bellacosa, J.
 The defendants, collectively referred to as the Department of Health (DOH), adopted a new method in 1986 for Medicaid reimbursement to nursing homes. Shortly thereafter, to contain costs and reduce all reimbursements, DOH effected an across-the-board percentage reduction to the new reimbursement rate method as a purported "corrective measure”. Plaintiff, New York State Association of Counties (NYSAC), sued to annul this Medicaid reimbursement recalibration regulation (10 NYCRR 86-2.31). We hold that NYSAC’s lawsuit was timely commenced and that the regulation should be *162 annulled as lacking a rational basis. Thus, the order of the Appellate Division granting DOH summary judgment should be reversed and NYSAC’s motion for summary judgment should be granted.
FACTUAL AND LITIGATION CONTEXT
NYSAC is a nonprofit association of all 62 counties in this State, 42 of which own and operate nursing homes or residential health care facilities. Prior to January 1986, Medicaid reimbursement rates were calculated based on a per-day per-patient cost determined on the basis of allowable costs in a prior year — the base year — increased by a trend factor to account for inflation but limited by certain ceiling costs. Under that method, a facility received the same per diem rate for all patients in its care, regardless of the severity of each patient’s care needs or condition.
In October 1985, DOH promulgated the "Long Term Care Case Mix Reimbursement System” (System) effective January 1986. The System is composed of four components: direct, indirect, noncomparable and capital costs (10 NYCRR 86-2.10 [b] [1] [ii]). The only aspect at issue in this case is the "direct” component of the rate formula, arrived at by a methodology known as RUG-II ("Resource Utilization Group”) (see, 10 NYCRR subpart 86-2). The System was designed to produce reimbursement rates that reflect the relative resource needs of patients and to provide an incentive to facilities to reduce expenditures and to admit patients requiring more resource-intensive services and care. It was designed to be budget-neutral, i.e., it was not intended to increase over-all Medicaid reimbursement. Based on extensive study and analysis of patients and data in 1984 and 1985, 16 patient classification categories or "Resource Utilization Groups” were established (see, 10 NYCRR Appendix 13-A). Under this RUG-II formula, each patient is categorized based on a "Patient Review Instrument” (the PRI form), completed semiannually by a qualified registered nurse (10 NYCRR 86-2.30 [c] [2]). The PRIs require detailed information evaluating patients’ conditions, treatments, dependencies and required care, needs and services. PRIs are also certified by the facility’s operator and the responsible nurse assessor (10 NYCRR 86-2.30 [c] [4]). The weighted sum of a facility’s patient distribution in the 16 categories is its "case mix index” (CMI). Reimbursement rates under the RUG-II method were based on the number of *163 patients in each category for whom a facility was caring, i.e., the facility’s total CMI.
The reimbursement rates were initially based on the Statewide average CMI derived from the data submitted on PRIs in 1985. Facilities were notified in November 1985 of their 1986 reimbursement rates based on the 1985 PRIs. However, on August 6, 1986, just seven months after the RUG-II method went into effect, DOH proposed to the State Hospital Review and Planning Council that the payment rates under the RUG-II method should be reduced. The process was dubbed "recalibration” and was then defined as the resetting of prices that correspond to the CMIs, that is, new reduced rates were to be assigned to the CMI figures (see, 10 NYCRR Appendix 13-A). The proffered justification for this "recalibration” was to set rates for the RUG-II system "on the basis of the most accurate data available regarding patient mix.” (Emphasis added.) DOH explained that from 1985-1986 the facilities’ understanding of the patient assessment system had improved in such a way as to increase the accuracy of the PRIs in 1986, thus increasing facilities’ CMIs. DOH determined the reimbursement rates should therefore be adjusted downward, i.e., recalibrated, because 1986 PRIs were being completed based on "a fuller understanding of the implications of the PRI regulations, and thus [were] more representative of the future PRI data the Department [would] receive.”
DOH recognized that to determine the justifiable percentage it would be necessary to separate the change in CMI attributable solely to more accurate PRI data from the increase in CMIs attributable to actual change in patient conditions, care needs and resource utilization. In an effort to document that differentiation, DOH compared CMIs for patients in 1985 with CMIs for patients in 1986, excluding data for patients whose length of stay at a facility was fewer than 90 days and those admitted after January 1, 1986. DOH determined that the average increase in CMI was 3.92%, or 3.2% if rehabilitation patients were excluded. DOH then concluded that the improved accuracy in PRI completion, or "paper optimization”, had resulted in an increase in RUG-II categorization and consequently CMI unrelated to patient condition or care needs. This, in turn, resulted in larger reimbursements without a correlative increase in resource utilization. That is, increasingly more accurate PRIs resulted in higher reimbursement to facilities, while the level of care remained unchanged, according to DOH’s cost containment calculus. The apparent *164 explanation is that DOH found it unacceptable that some facilities were garnering increased reimbursements by achieving improved compliance under the new methodology and its reporting requirements. DOH, in effect, penalized all providers by altering the reimbursement formula downward.
The Hospital Review and Planning Council adopted and the Commissioner of Health approved the uniform reduction or "recalibration” of 3.035%, effected by the following challenged regulation:
"86-2.31 Recalibration, (a) For rate periods commencing on or after January 1, 1987, notwithstanding any other provisions of this Subpart, the direct component of facility rates, determined in accordance with sections 86-2.10 and 86-2.11 of this Subpart, shall be reduced by 3.035 percent to reflect a recalibration adjustment based on the change in the aggregate statewide case mix index attributable to factors other than changes in patient population or condition.” (10 NYCRR 86-2.31 [emphasis added].)
The recalibration reduced the direct component of every facility’s Medicaid reimbursement rate by 3.035% regardless of actual change — if any — experienced by a facility in its CMI. DOH did not reset rates that corresponded to the CMI values, as it had explained it would do.
DOH filed the recalibration regulation with the Secretary of State on December 10, 1986. The implementation date was July 1, 1987, retroactive to January 1, 1987 (10 NYCRR 86-2.31 [b]). Rate computation notices for 1987 were sent to NYSAC’s members from October 1986 through June 1987 indicating that the respective facility’s reimbursement rates would be subject to a "zero percent” recalibration rate. Nonetheless, in June 1987, DOH changed its course and notified all facilities that the direct cost component for 1987 rates would be reduced by 3.035%, retroactive to January 1987, adverting to nonempirical "[s]tudies [that] have shown an increase in case mix [since September 30, 1985], which has been determined to be unrelated to patient characteristics.” On June 2, 1987, NYSAC’s members received rate computation notices for the first time, reflecting the reduced 3.035% recalibration rate.
NYSAC brought a CPLR article 78 proceeding on October 2, 1987 alleging in three causes of action that the regulation: (1) *165 is arbitrary and capricious, an abuse of discretion and without a rational basis; (2) violates Public Health Law §§ 2807 and 2808; and (3) deprives the nursing homes of due process of law. DOH’s motion for an order dismissing the petition on Statute of Limitations grounds was denied and the proceeding was converted into a declaratory judgment action (see, CPLR 103 [c]). Supreme Court applied the CPLR 213 six-year Statute of Limitations and determined that the action was timely. Thereafter, Supreme Court granted NYSAC’s motion for summary judgment and declared the recalibration regulation (10 NYCRR 86-2.31) null and void as arbitrary and capricious, and directed DOH to recompute the reimbursement rates for the affected years, determining that there was no "rational basis for the promulgation of a rule so broad in scope.”
The Appellate Division unanimously reversed and granted summary judgment to DOH dismissing NYSAC’s .first and second causes of action as time barred and declared that the recalibration regulation is constitutional (156 AD2d 14). That court applied the CPLR 217 article 78 four-month Statute of Limitations, holding that NYSAC’s cause of action accrued on the effective date of the regulation, January 1, 1987, and that the limitation period had expired before NYSAC commenced this action in October 1987 (compare, New York State Assn. of Counties v Axelrod, 150 AD2d 845, lv dismissed 75 NY2d 765).
STATUTE OF LIMITATIONS
Article 78 proceedings must be commenced within four months after the determination to be reviewed becomes "final and binding upon the petitioner” (CPLR 217; Matter of Village of Westbury v Department of Transp., 75 NY2d 62, 72; see, Siegel, NY Prac § 566 [2d ed 1991]). NYSAC’s lawsuit is timely because it was commenced within four months of its members’ receipt of the rate recomputation notices which, for the first time, apprised the facilities of their actual reimbursement rates. The DOH determination could not be deemed "final” for article 78 purposes until NYSAC’s members were able to ascertain the consequences of the recalibration regulation so that its impact could be accurately assessed, including awareness whether the facilities were aggrieved (see, Matter of Martin v Ronan, 44 NY2d 374, 380-381; Matter of Jewish Mem. Hosp. v Whalen, 47 NY2d 331, 343; see also, Matter of Abrams v Public Serv. Commn., 61 NY2d 718, affg without opn 96 AD2d 701). Although the facilities had received notice on *166 or around November 1, 1986 of their 1987 rates, which identified the direct component of the rate, that notification preceded the December 1986 adoption of the recalibration regulation which effected the 3.035% reduction to the direct cost component. NYSAC’s members could not reasonably calculate the impact of the recalibration prior to receipt of the rate calculation notice on June 2, 1987, since their CMIs and therefore their reimbursement rates fluctuated significantly between November 1986 and June 2, 1987.
It is worthy of note that DOH’s notification to the facilities up to two months before the July 1 implementation date indicating that recalibration would be at "zero percent” injected ambiguity and uncertainty as to when and whether the determination became — or was intended to be — final and binding (Mundy v Nassau County Civ. Serv. Commn., 44 NY2d 352, 358; see, Matter of Edmead v McGuire, 67 NY2d 714; Matter of Biondo v New York State Bd. of Parole, 60 NY2d 832, 834).
Since the lawsuit was timely commenced within the four-month period of limitations — the shortest possible period arguably applicable to the claims asserted in the petition — there is no reason to address the question whether the six-year Statute of Limitations governing declaratory judgment actions might be applicable to the petition challenging this regulation.
MERITS — IRRATIONALITY
We start our discussion of the merits with the elemental proposition that an administrative regulation will be upheld only if it has a rational basis, and is not unreasonable, arbitrary or capricious (Matter of Bates v Toia, 45 NY2d 460, 464; Matter of Bernstein v Toia, 43 NY2d 437, 448; Ostrer v Schenck, 41 NY2d 782, 786). Administrative rules are not judicially reviewed pro forma in a vacuum, but are scrutinized for genuine reasonableness and rationality in the specific context (Matter of Bates v Toia, supra, at 464). The challenger must establish that a regulation "is so lacking in reason for its promulgation that it is essentially arbitrary.” (Matter of Marburg v Cole, 286 NY 202, 212; see, Molina v Games Mgt. Servs., 58 NY2d 523, 529; Matter of Bates v Toia, supra, at 464; Matter of Bernstein v Toia, supra, at 448; Ostrer v Schenck, supra, at 786.) DOH’s rate-setting action may be declared null and void " 'upon a compelling showing that the calculations from which [it is] derived [are] unreasonable’ ” (Matter of Society of N. Y. Hosp. v Axelrod, 70 NY2d 467, 473; *167 Matter of Catholic Med. Center v Department of Health, 48 NY2d 967, 968; Matter of Sigety v Ingraham, 29 NY2d 110, 114). It is not the judicial function to address, and we do not consider, the "policy considerations underlying the standard” applied on review (dissenting opn, at 170).
We conclude that the recalibration regulation effecting a 3.035% reduction to Medicaid reimbursement rates regardless of the actual causes of facilities’ change — if any — in CMI and without record evidence to support DOH’s supposition that the CMI increase is solely attributable to "paper optimization” lacks a rational basis.
DOH, on the one hand, promulgated and implemented the RUG-II methodology so that reimbursement rates would reflect relative resources expended on behalf of patients. The new methodology, established after extensive study, was designed to provide incentives to facilities to provide more intensive treatment to patients where necessary, to admit patients requiring more resource-intensive services and care, and to assure that reimbursement would be based on facility-specific CMIs. Then, on the other hand, when DOH did not like some of what this new process had wrought, it swiftly superimposed the recalibration reduction regulation. The universal 3.035% reduction to the direct component of all facilities’ rates — without adequate record support or correlation to the reasons for facilities’ change in CMI — clashes with the design and intendment of the RUG-II methodology. DOH seems to be taking back from facilities with one hand that which it proffered them individually with the other — incentives for improved care for the relatively more needy, reimbursed accordingly. This approach to administrative rule making must not be countenanced within the limited, though searching, judicial review.
The record supports the arbitrariness of the percentage figure selected for reimbursement reduction — 3.035%. DOH did not reduce the rates of the RUG-II categories themselves, but instead reduced the direct component by an arbitrary, across-the-board percentage figure. DOH has attempted to justify this percentage reduction under the rubric of improved accuracy in PRI completion, or "paper optimization”. While it appears that with experience facilities improved the accuracy of their PRI reporting methods, critical to our narrow holding of irrationality in this particular case is that the DOH documentation in the record totally lacks any justification for the *168 conclusion that the resulting increase in facilities’ CMIs was solely attributable to factors other than actual change in patient conditions, care needs and resource utilization. The blanket percentage reduction selected was, as DOH concedes, the result of negotiation, compromise and estimation. That is not the equivalent of the requisite rationality. It was not based on a rational, documented, empirical determination that all facilities had experienced — even on average or mean — a 3.035% increase in CMI attributable solely to improved PRI reporting compliance experience. While discourse with the affected industry is surely appropriate, it is no substitute for DOH’s obligation to promulgate reasonable and rational regulations. DOH failed to substantiate what therefore amounted only to a theory and assumption — arrived at swiftly and certainly not after any reasonable or measured period of empirical documentation, assessment and evaluation — that patient deterioration, i.e., actual increased resource utilization, played no part in the increase in CMIs. Its predicates are entirely conclusory.
Adding to the lack of rational basis of this recalibration regulation is the discriminatory and disparate impact it has on and among the affected facilities where DOH has utterly failed to substantiate its conclusion that "paper optimization” alone caused the average increase in CMIs State-wide. Facilities that experienced little or no change in CMIs received disproportionate aggregate reductions to the direct cost component of their rates — the largest reimbursement component —while facilities which realized substantial increases in CMIs received relative windfall benefits by having their direct component rates reduced in aggregate by far less than their realized increases. This impact was particularly disproportionate on county nursing homes which the record evidence indicates experienced the least upward movement in CMIs.
We do not, of course, conclude that across-the-board reimbursement formulae based on State-wide averages are impermissible. Rather, our ruling is based on petitioner’s demonstration that DOH failed on these facts to document and substantiate its conclusion and the supposition on which this recalibration regulation rests — that the State-wide change in CMI was solely attributable to "paper optimization” and not at all attributable to patient deterioration, increased resource utilization and patient care.
The characterizations in the dissenting opinion of the major *169 ity’s analysis as generating unwarranted precedential policy and administrative law consequences are inaccurate. This straightforward application of the traditional judicial review function to a particular record and regulation, rather than proving "troublesome”, will help to insure that powerful regulatory officials conform to ordinary standards of documented and rational rule making. The courts should not be relegated to searching for and fashioning justifications for agency actions, based on "simple processes of elimination” at the appellate review stage.
Finally, we need not and do not reach the constitutional question. We have also examined the other issues raised by the parties and determine that they do not affect the analysis or result in this case. Finally, we note with no implication whatsoever the pending challenge to the primary regulation, the RUG-II system (New York State Assn. of Counties v Axelrod, 150 AD2d 845, lv dismissed 75 NY2d 765, supra).
Accordingly, NYSAC’s appeal taken as of right should be dismissed on the ground that no substantial constitutional question is directly involved; NYSAC’s motion for leave to appeal should be granted, and the order of the Appellate Division should be reversed, with costs, and the judgment of Supreme Court declaring the recalibration regulation (10 NYCRR 86-2.31) null and void reinstated.