*73 OPINION OF THE COURT
Edward H. Lehner, J.
The legal issue presented on this application is whether the four-month Statute of Limitations provision of CPLR 217 is extended when, on reconsideration of an audit conducted by a State agency, the amount found owing is reduced.
Petitioner Lower Eastside Service Center, Inc. (LESC) brings this article 78 proceeding to compel respondent New York State Division of Substance Abuse Services (DSAS) to hold an evidentiary hearing concerning certain expenses disallowed by the agency following an audit of LESC’s operations. Alternatively LESC requests a trial to determine whether DSAS’s actions in arriving at the determination sought to be reviewed were arbitrary and capricious.
LESC is a not-for-profit corporation which operates drug abuse treatment programs and other related services. DSAS is the State agency responsible for the regulation and licensing of substance abuse programs, and is authorized to provide funding to community-based not-for-profit substance abuse treatment providers such as LESC.
Funding of LESC is provided by DSAS pursuant to annual contracts which provide for the monthly reimbursement to LESC for expenses detailed in vouchers provided to the agency. Pursuant to contracts covering the period from July 1, 1984 through September 30, 1986 LESC contracted with DSAS for funding up to a maximum reimbursable amount of $3,674,715 in return for the administration by LESC of specified treatment programs and services.
In 1987 DSAS commenced an audit of LESC’s operations during the aforesaid contractual period. A report, referred to by DSAS as "our final audit report”, was issued by it on December 1, 1989 in which expenses totalling $482,093.61 previously paid by it to LESC were disallowed. The agency claims that these expenses were either inadequately documented or, as in the case of automobiles purchased for LESC executives, were unauthorized. The audit also detailed numerous deficiencies in LESC’s financial and administrative operations, and called for the eventual recoupment from future LESC allotments of the full $482,093.61, without specifying how the recoupment would be carried out.
On December 8, 1989 the president of LESC wrote to DSAS to protest the disallowances. However, in another letter dated December 20, 1989 LESC recognized its "failure in financial *74 operating procedures” as detailed in the audit report, and stated its intention to implement new procedures in order to correct the problems. In a letter dated February 2, 1990 the agency stated its intention "to meet expeditiously with representatives of the Board and program administration to insure that agreed-upon program administrative changes are implemented and that an appropriate and mutually agreeable audit repayment schedule is developed”. Another letter to LESC from the agency, dated February 5, 1990, directed LESC to "develop and submit a plan which accommodates repayment” of the refund.
As a result of an April meeting, the agency agreed to reexamine the final audit disallowances pertaining to certain renovation costs only. In a letter dated April 26, 1990 DSAS set forth this intention and stated that "[ujpon conclusion of this process, and application of any resultant adjustments, the total audit refund due DSAS shall be finally fixed”. DSAS claims that it expressly stated during the April meeting that it would not reexamine any other portion of the disallowed expenses.
On October 4, 1991 DSAS notified LESC by letter "of the final status of the * * * Division audit * * * and the steps which are planned * * * to recover the audit refund due from LESC, as finally determined”. DSAS agreed in the letter to reinstate $28,073.70 of the $110,524.11 renovation costs in dispute, reducing the "final audit refund due” to $454,019.91, and informed LESC of its plans "to recover the $454,019.91, through deductions from LESC’s payable expense vouchers on DSAS contracts, over a period of twenty-four (24) months, at $18,917.50 per month, beginning with January 1992 expense vouchers”. By letter dated October 29, 1991, LESC, for the first time, demanded a full evidentiary hearing on the disputed items. The request was denied on the grounds that no hearing was required by law. This proceeding was then commenced on February 3, 1992.
DSAS argues that the petition is untimely under the four-month Statute of Limitations set forth in CPLR 217. The issue at hand relates to the date on which petitioner’s claim accrued.
DSAS maintains that the audit became final upon the issuance of its report on December 1, 1989. LESC counters that it was not "aggrieved” for purposes of the accrual of the Statute of Limitations until October 4, 1991 when the agency *75 imposed the actual recoupment schedule implementing the refund sought in the final audit report.
The four-month Statute of Limitations runs from the point when an administrative decision becomes "final and binding”, which is "when it 'has its impact’ upon the petitioner, who is thereby aggrieved” (Matter of Edmead v McGuire, 67 NY2d 714, 716). When the determination is unambiguous and its effects certain, the statute runs from the date of the petitioner’s notification. This will not be the case where the notice injects "ambiguity and uncertainty as to when and whether the determination became — or was intended to be — final and binding” (New York State Assn. of Counties v Axelrod, 78 NY2d 158, 166).
In order to determine when LESC’s right to bring this proceeding accrued it is necessary to "first ascertain what administrative decision petitioner is actually seeking to review and then find the point when that decision became final and binding and thus had an impact upon petitioner”. (Matter of Monteiro v Town of Colonie, 158 AD2d 246, 249.)
LESC cites cases said to stand for the proposition that, as a general rule, the right to commence a review of an audit establishing a reimbursement allegedly due to a State agency accrues not when the audit is issued, but when a payment based on the audit is actually made reflecting the reimbursement or, at least, when the petitioner is notified of the actual reimbursement rate adjustments. Petitioner argues also that the agency created ambiguity as to whether the determination was to be considered final and binding, which ambiguity must be held against the agency.
In both Board of Educ. v Ambach (49 NY2d 986, cert denied 449 US 874) and Solnick v Whalen (49 NY2d 224), the date suggested as the last which might serve to give rise to the plaintiff’s claim, respectively the "date upon which the first reimbursement payment, reflecting cost allowances, was made” (supra, at 987) and the date upon which the plaintiffs "were notified of the actual reimbursement rate adjustments applicable as a result of the audit” (supra, at 233), are given as hypotheticals since, in both instances, the Statute of Limitations had run even if these outside dates were utilized. Thus, neither of these cases state a rule that either payment or notice of the means of reimbursement must be viewed as the date on which a determination to seek reimbursement set forth in an audit would have its impact. In neither Chemical *76 Bank v Regan (90 AD2d 581, affd 58 NY2d 809) nor Matter of Board of Educ. v State Educ. Dept. (116 AD2d 939), also relied upon by petitioner, is there any indication that the aggrieved parties had ever received express formal notice setting forth the amount of the reimbursements which would be sought against them until the time payment was actually made reflecting the assessments. Thus, none of these cases can be said to clearly support petitioner’s position.
In New York State Assn. of Counties v Axelrod (supra, at 165), the right to review a recalibration of Medicaid reimbursement rates was found to accrue when the petitioners received rate recomputation notices "which, for the first time, apprised the facilities of their actual reimbursement rates”. The Court reasoned that the determination to recalibrate rates could not be deemed final for article 78 purposes until the parties aggrieved "were able to ascertain the consequences of the recalibration regulation so that its impact could be accurately assessed, including awareness whether the facilities were aggrieved”, something which could not be determined, and was indeed ambiguous, prior to actual receipt of the rate calculation notice.
LESC cannot say that it was unable to ascertain the consequences of the final audit report. It knew the nature and extent of its grievance, there being no doubt from the language of the audit of the agency’s intention to collect the refund, even if the exact schedule of reimbursement had yet to be designed. Thus, if respondent had not agreed to reconsider the audit results, this proceeding would be time barred.
It is well established that an application for reconsideration to, or negotiations with, an agency does not serve to extend the period of limitations (Matter of DeMilio v Borghard, 55 NY2d 216, 220; Matter of Calvert v Westchester County Personnel Off., 128 AD2d 523).
However, where an agency actually reconsiders a prior determination, the following rules, set forth in Matter of Corbisiero v New York State Tax Commn. (82 AD2d 990, 990-991, affd for reasons stated below 56 NY2d 680), apply: "Where consideration of a redetermination is granted as a matter of grace, as here, the nature of the reconsideration determines whether the time to commence a review is extended. Where there is a fresh and new redetermination, petitioner’s period within which to commence a review proceeding is renewed (Matter of Camperlengo v State Liq. Auth., *77 16 AD2d 342, 344). Similarly, where new additional evidence is presented on a rehearing, the limitation period is extended. However, where no new evidence is presented to the agency, the time to commence an article 78 proceeding will not be extended (Matter of Davis v Kingsbury, 27 NY2d 567; Matter of Express Limousine Serv. v Henessy, 72 AD2d 864). Here, the record does not indicate that any new evidence was presented by petitioner at the rehearing held on July 9,1980 and, in any event, the merits of the appeal were not determined at that rehearing which involved only the abatement of petitioner’s penalty and interest”. In that case, since the only change made upon reconsideration was a rebate of penalties and interest, and since no new evidence was presented and the merits not considered at the rehearing, the Court held that there was no "formal reconsideration on the merits so as to revive the Statute of Limitations” (supra, at 991).
However, here what DSAS did is not merely eliminate a penalty or abate interest, as was done on reconsideration in Corbisiero (supra), but rather it modified on the merits the determination set forth in its December 1, 1989 audit by reducing the amount of disallowed expenses. This constituted a new determination, which is referred to in respondent’s October 4, 1991 letter as the "final status” of the December 1, 1989 audit.
The court has located no case relating to the applicability of CPLR 217 where reconsideration of an audit resulted, without the submission of any new evidence, in a modification on the merits of the original determination. Respondent urges that under this situation the court should find that the audit results of December 1, 1989 are final and binding as of that date for the entire amount of the refund determined by the audit, less the amount it determined on October 4, 1991 not to be owing, with the consequence that this proceeding commenced on February 3,1992 is time barred.
The court rejects respondent’s approach and finds that by acting to reduce the amount of the disallowed expenditures, the period of limitations commenced to run anew on October 4, 1991 when it advised LESC of the "final status” of the audit. Here, although the modification was a reduction of only approximately 6% of the total expenses, it was about 25% of the disallowed renovation costs. There being only one final determination, the period of limitations must be calculated from only one date even though aspects of the audit other than renovation costs were not reconsidered. There cannot be *78 different periods of limitations for the several aspects of a single audit.
In writing for a three-Judge minority in Matter of Davis v Kingsbury (27 NY2d 567), Judge Breitel noted the lack of clarity of the law in this area, stating (at 569-570):
"The cases are in disarray on whether when reconsideration is granted as a matter of grace, that is, without statutory mandate or authorization, the determination upon reconsideration is reviewable if instituted within four months after the second determination * * *
"The practice is or should be similar to that governing the time to take an appeal, which runs from the rendering of the second decision upon reargument, even though the original decision is followed and there has been no additional evidence or argument * * *
"There is a sound practical reason for not conditioning the running of the four-month period from a full reconsideration on the receipt of new evidence. Otherwise, if the administrative board agrees to reconsider, a petitioner might fear, rightly or wrongly, that he would prejudice his case by seeking judicial review of the old determination, while reconsideration is under way * * * In view of the limited judicial review available, in any event, for administrative determinations, there is anticipatable hesitation, even reluctance, to initiate or even think about precipitate recourse to the courts, while there is hope of broader redress before the agency.”
In that case the majority held that a second request to modify petitioner’s status with the Workers’ Compensation Board was merely a request for a rehearing, the denial of which did not commence anew the four-month period of CPLR 217. It should be noted that the fear of prejudicing one’s position before an administrative agency, as noted by Judge Breitel, is particularly applicable to the case at bar where future allocations of funds to petitioner are determined at the discretion of the respondent agency.
Since respondent filed its answer but essentially only challenged the petition on Statute of Limitations grounds, the court finds that a trial, as provided for in CPLR 7804 (h), is necessary to determine the merits of petitioner’s claims. Accordingly, after the filing of a statement of readiness and note of issue, the clerk shall place this proceeding on the Trial Calendar.