OPINION OF THE COURT
Titone, J.
These appeals have arisen in the aftermath of our 1991 decision in New York State Assn. of Counties v Axelrod (NYSAC) (78 NY2d 158), in which we struck down a 1987 *257 Medicaid nursing home reimbursement rate adjustment on the ground that it was not rationally based. The new question raised by the present appeals is whether respondents, having conducted a study and revised the disputed rate adjustment in accordance with the results, may apply the revised rate schedule retroactively as a basis for computing petitioners’ reimbursement for the years preceding its promulgation. We hold that such retroactive rate-making is impermissible under Public Health Law § 2807 (7) (a) and that the prohibition contained in that statute is not suspended because the belated rate decision was necessitated by litigation.
The facts underlying the 1987 rate adjustment are fully explored in our opinion in NYSAC (supra) and need not be repeated in detail here. Briefly stated, in October of 1985, the Department of Health (DOH) promulgated a new system for calculating Medicaid nursing home reimbursement rates. The new system, which was to be effective January 1986, was called "Long Term Care Case Mix Reimbursement System” and was built upon four categories of component cost variables. Reimbursement rates under this system were to be calculated, in part, on the individual facility’s "case mix,” which was to be determined by reference to 16 patient categories, corresponding roughly to the severity of the patients’ illnesses and the intensity of the required care.
A few months into the new system, DOH concluded that a downward adjustment in rates was required to compensate for an over-all increase in facilities’ reported "case mix indices” (CMI’s), which DOH believed was attributable to the facilities’ increased familiarity with the reporting method rather than to any genuine change in patient condition or level of need. Having "confirmed” its belief by comparing the 1985 and 1986 CMI’s for certain patients, DOH adopted an across-the-board 3,035% reduction, which it termed a "recalibration adjustment.”
The "recalibration” was challenged in a timely proceeding brought by a nonprofit association of the 62 counties in New York State. The litigation culminated in a decision by this Court holding that the promulgated reduction was irrational because, among other reasons, it was based on an assumption that had not been empirically documented and was not correlated, "even on average or mean,” to any actual CMI increase based on factors other than patient deterioration or increased utilization of resources (NYSAC, 78 NY2d, at 167-168, supra). *258 As a result of this conclusion, we reinstated the judgment of Supreme Court in NYSAC, which had declared the recalibration regulation "null and void” and had remanded to the agency "to recompute the Medicaid reimbursement rates in effect from January 1, 1987 onward for each county nursing home without reference to, or utilization of, the recalibration regulation” (order and final judgment, NYSAC).[1]
Following this remittal, DOH repealed the recalibration regulation and, after conducting an "analysis and study,” the agency promulgated a new recalibration adjustment in December 1991, to be applied to the 1989-1991 rate years (10 NYCRR 86-2.31 [a]).[2] Unlike its predecessor, the new recalibration adjustment was ostensibly based on the individual experience of each nursing home. Additionally, the recalibration adjustment for the rate years between 1989 and 1991 was capped so that no facility would experience a reduction of more than 3.035% — the amount of the 1986 recalibration reduction that was invalidated in NYSAC.
To provide the required documentation, the agency compared the reported changes in facilities’ CMI from 1985 to 1988, limiting the analysis to those patients who could be positively identified and traced through their Social Security numbers. The agency then subtracted from the percentage change a "length of stay” adjustment, which was supposed to account for actual changes in the care needs of the patients encompassed in the study. DOH’s assumption was that the "length of stay” adjustment could be used as a means of approximating patient deterioration over time and that that measurement could, in turn, be used to draw inferences about what portion of the percentage increase in CMI represented an actual increase in a sicker population’s demand for facilities’ resources. DOH rejected other possible measurement criteria, such as patients’ chronological age and combinations of other variables (gender, region, payor), because they did not yield the necessary statistical stability. DOH acknowledged, however, that the relationship between patient length of stay and patient acuity could not be statistically validated.
Petitioners Jewish Home and Infirmary of Rochester (Jew *259 ish Home) and New York Association of Homes and Services for the Aging (NYAHSA) commenced these separate CPLR article 78 proceedings to challenge respondents’ decision to apply the new recalibration adjustment retroactively to prior rate years. In support of their position, petitioners relied principally on Public Health Law § 2807 (7) (a), which requires that the Commissioner of Health give hospitals and other health-related service providers advance notice of their reimbursement rates. Both petitioners argued alternatively that the new recalibration adjustment was irrationally promulgated. Petitioner Jewish Home also complained about respondents’ method of calculating its facility utilization.
The Supreme Court, Albany County, held in petitioners’ favor in both cases, granting them essentially all of the relief that they sought. In the proceeding brought by NYAHSA, the court concluded that the new recalibration rate was flawed by the same defect as its predecessor because of the absence of any empirical analysis or validation to support it.
On respondents’ appeals, the Appellate Division, Third Department, ruled that the new recalibration adjustment could not be applied retroactively to the rate years between 1989 and 1991 (190 AD2d 197 [Jewish Home]; 195 AD2d 822 [NYAHSA]). Inasmuch as the court decided the issue on this ground, it did not reach the substantive question of whether the new adjustment was irrational (see, NYAHSA, 195 AD2d, at 825, supra). In both cases, the Appellate Division enjoined respondents from applying the new recalibration adjustment to rate years 1989-1991 and remitted to the agency for recomputation of petitioners’ rates for those years without using the invalidated regulation, requiring repayment of any reimbursement withheld as a result of that regulation.[3] In the Jewish Home appeal, the Appellate Division also upheld the Supreme Court’s determination that respondents’ method of computing facility utilization was irrational. This Court subsequently granted respondents leave to appeal in both cases. We now affirm.
The central issue on these appeals is whether, having had part of its existing method for computing nursing home reimbursement rates judicially nullified, DOH may promulgate a *260 new method and then apply that method in determining the rates for prior years. The determinative provision is Public Health Law § 2807 (7) (a), which provides: "The commissioner [of DOH] shall notify each hospital and health-related service of its approved rates of payment which shall be used in reimbursing for services provided to persons eligible for payments made by state governmental agencies at least sixty days * * * prior to the beginning of an established rate period for which the rate is to become effective.” This provision, on its face, prohibits retroactive rate-making (Jordan Health Corp. v Axelrod, 67 NY2d 935, 936).[4]
Despite Public Health Law §2807 (7) (a)’s plain language, DOH contends that the statute does not bar its present attempt to apply its 1991 recalibration adjustment in the calculation of reimbursement rates for the two years before it was promulgated. Simply put, respondents’ contention is that the statute was intended to apply only to the "normal rate-making process” and has no application to rate-making determinations where, as here, those determinations have been made in response to judicial decisions nullifying the prior rate. Respondents cite no case law or other cognizable authority to support their proffered proposition. Rather, they base their position largely on the a priori assumption that application of section 2807 (7) (a) in this context is "illogical” because all rates employed after judicial nullification are necessarily "retroactive” to the extent that they are used to reimburse providers for services rendered in prior years. For the reasons that follow, we reject respondents’ effort to construct a detour around the clear mandate of Public Health Law § 2807 (7) (a).
First, respondents’ a priori argument, which has been consistently rejected by the lower courts (Matter of Wellsville Manor Nursing Home v Axelrod, 142 AD2d 225; Hurlbut v Whalen, 58 AD2d 311, cited with approval in Jordan Health Corp. v Axelrod, supra, at 936) overstates the situation in a way that distorts analysis. Here, as in many analogous situations, the judicial decision that prompted the new rate-making decision invalidated only a discrete component of the rate calculus. The remainder of the preexisting system was left intact and continues to provide a viable and legally valid basis *261 for reimbursement. Thus, contrary to respondents’ hyperbole, the rule that petitioners advance does not itself require any retroactive rate-making. Rather, it merely entails applying to the prior years a properly and timely promulgated method of computing rates — minus the element that was nullified.[5]
Second, respondents’ contention that Public Health Law § 2807 (7) (a) was intended to apply only to the "normal rate-making process” is belied by Public Health Law § 2808 (11). Enacted in 1992, that statute provides that the provisions of section 2807 (7) (a) relating to advance notification of residential health care facility rates "shall not apply to prospective or retroactive adjustments to rates that are based on rate appeals filed by [the] facility, audits, changes in patient conditions or acuity levels, the correction of errors or omissions of data or errors in the computations of such rates, the submission of cost report data from facilities without an established cost basis or as otherwise authorized by law.” Manifestly, this provision pinpointing specific extraordinary situations in which the rule prohibiting retroactivity should not apply would be surplusage if, as respondents argue, that rule were intended in the first instance to apply only to the "normal rate-making process.”
*262 Moreover, a review of the Legislature’s handling of this retroactivity problem demonstrates the weakness in respondents’ position. The Legislature adopted Public Health Law § 2808 (11) in 1992 to remedy a perceived flaw in Public Health Law § 2807 (7) (a) that arose as a result of Matter of Wellsville Manor Nursing Home v Axelrod (supra; see, L 1992, ch 25; Mem of A. Gottfried [Sponsor] in Support of Assembly Bill A 9461, Bill Jacket, L 1992, ch 25). In Wellsville, the Appellate Division applied section 2807 (7) (a) to prohibit retroactive revision of a new facility’s rates based on its actual experience and reported costs. At the time of the enactment, the sponsors of the remedial legislation asserted that "[t]he current statute restricts the capacity of [DOH] to recognize legitimate rate adjustments to an already published rate” (Mem in Support, Senator Tully and Assemblyman Gottfried, Bill Jacket, L 1992, ch 25). Despite this understanding of Public Health Law § 2807 (7) (a)’s scope and despite the sponsors’ manifest intention to draft a remedial statute that went beyond the narrow problem created by Wellsville Manor Nursing Home, the resulting legislation, Public Health Law § 2808 (11), does not address the question of retroactive application of the new recalibration adjustment. Significantly, this is not a case of mere legislative silence or inaction (see, Rent Stabilization Assn, v Higgins, 83 NY2d 156, 170; Clark v Cuomo, 66 NY2d 185, 190-191). Rather, it is a case where the Legislature has addressed a subject and has, in fact, created a list of exceptions to a general rule, but has chosen to omit mention of one exception in particular. In such a case, the maxim expressio unius est exclusio alterius is applicable (see, McKinney’s Cons Laws of NY, Book 1, Statutes § 240, at 412-413 ["where a statute creates provisos or exceptions as to certain matters the inclusion of such provisos or exceptions is generally considered to deny the existence of others not mentioned”]).
This maxim is especially apt in this situation, where the available documentation indicates that the question of the recalibration adjustment’s retroactivity was deliberately not mentioned in the 1992 legislation. As respondents acknowledge in their briefs, Public Health Law § 2808 (ll)’s language was the product of discussions between DOH officials and representatives of the residential health care industry. The statute’s terms represent "the only exceptions [to section 2807 (7) (a)] that both industry and Health Department officials can agree upon,” and "[the] situations * * * identified in *263 th[e] bill” are the ones in which, according to "[b]oth industry and Health Department officials agree * * * retroactive rate setting is acceptable” (letter from C. Murray, General Counsel for NY St Health Facilities Assn, to J. Marqusee, Asst Dir, Dept of Health [dated Nov. 26, 1991] [Murray letter], Bill Jacket, L 1992, ch 25). Most critically, the correspondence establishes that the parties to these discussions were well aware of the present dispute over the retroactive application of DOH’s new recalibration rate and were evidently unable to reach a similar compromise for submission to the Legislature. According to the correspondence, whose accuracy respondents do not dispute, DOH agreed not to "attempt to construe [Public Health Law § 2808 (11)] as legislative authorization for retroactive recalibration such as the proposed regulation presently pending before the New York State Hospital Review and Planning Council”; instead, it would await a determination of "[t]he legality or lack thereof * * * based on other arguments” (Murray letter, op. cit.). Significantly, the Legislature subsequently failed to adopt proposed legislation authorizing retroactive recalibration on two separate occasions (Governor’s Budget Bill, 1992; Governor’s Budget Bill, 1993; see, Matter of Bliss v Bliss, 66 NY2d 382, 389).
In short, viewed in realistic terms, the legislative history demonstrates that Public Health Law § 2808 (ll)’s sponsors regarded section 2807 (7) (a) as having application well beyond the "normal rate-making process,” that those sponsors perceived a need to modify the existing rule precluding retroactive rate adjustments and that, despite extensive discussion between the interested lobbying elements, no agreement could be reached about the proper resolution of the recalibration adjustment problem. This situation is reminiscent of that presented in Boreali v Axelrod (71 NY2d 1, 13), in which, despite considerable lobbying by the various interested factions, efforts to achieve a legislative compromise failed. In Boreali, we rejected an attempt to circumvent the legislative process by resort to administrative rule-making. Here, respondents are attempting to circumvent the legislative process by invoking the judiciary’s power to construe an existing statute. As in Boreali, we reject the present circumvention effort by declining to read into Public Health Law § 2807 (7) (a) an exception that respondents were unable to obtain through the legislative process.
The policy arguments respondents make in support of the proposed exception are also unpersuasive in light of the
*264 foregoing background. It is respondents’ contention that permitting the new recalibration adjustment to be applied retroactively would not contravene Public Health Law § 2807 (7) (a)’s goals, which were to enable providers to engage in advance planning and to thereby encourage them to take cost-saving measures (see, Jordan Health Corp. v Axelrod, 67 NY2d 935, supra; letter by Senator T. Lombardi, Jr. [Apr. 22, 1974], Bill Jacket, L 1974, ch 682; id., letter by Senator W. Anderson [May 10, 1974]; id., Budget Report). Respondents contend that since the new recalibration adjustment’s 3.035% cap ensures that no provider will have a reimbursement rate that is lower than the rate prescribed under the invalidated rate, retroactive application of the new rate would not prejudice providers or interfere with the legislative purpose.
However appealing this argument may be as a matter of public policy, it is not a convincing one where, as here, the construction of a statute is at issue. The problem with the argument is, quite simply, that the statutory language and design do not support it. Respondents’ argument asks us to read into Public Health Law § 2807 (7) (a)’s advance notice requirement a complex proviso that excepts from its reach rates made after judicial nullification in those special cases where the new rate does not exceed the rate that has been annulled. To construe the statute as incorporating such a conditional proviso would be to overstep the bounds of statutory construction and enter the forbidden realm of judicial legislating.[6]
Our refusal to read the policy-based exception advanced by respondents into the statute is informed, in part, by our awareness that the Legislature has already spoken on the issue of exceptions to retroactivity and, in so doing, has not adopted the "capping” approach that respondents assert is essential to the underlying legislative policy (see, Public Health Law § 2808 [11]). Our decision is also informed by our awareness that there are, in fact, competing policies to be weighed. On the one hand are the policy considerations that respondents cite; on the other are the policies that favor encouraging the State to act carefully and responsibly when it initially establishes its reimbursement rates. The latter poli *265 cies would, of course, militate against permitting respondents to apply newly promulgated rates retroactively following a judicial decision invalidating an unlawful or irrationally determined rate (see, Tallahassee Mem. Regional Med. Ctr. v Bowen, 815 F2d 1435, cert denied 485 US 1020). The point is not that one or the other of these policies is wiser. Rather, the point is that it remains the task of the Legislature and not the judiciary to choose between them.
Finally, we note that nothing in our remittitur in NYSAC (78 NY2d 158, supra) suggested that respondents were authorized to recast the annulled recalibration adjustment and then apply it retroactively. Our order in NYSAC merely reinstated a judgment that directed respondents "to recompute the Medicaid reimbursement rates in effect from January 1, 1987 onward for each county nursing home without reference to, or utilization of, the recalibration regulation” (order and final judgment, NYSAC). The reinstated judgment makes no mention of a recomputation that includes a revised — and as yet unreviewed — recalibration element. Moreover, since the respondents in NYSAC did not make an alternative request for the right to recompute the reimbursement rates with a new recalibration adjustment, it cannot seriously be argued that this Court contemplated such relief, much less that it considered the effect that Public Health Law § 2807 (7) (a)’s antiretroactivity provisions would have on the Court’s power to grant it.
For all of the foregoing reasons, we hold that respondents cannot apply the recalibration adjustment adopted in response to our decision in NYSAC to rate years occurring before the new adjustment was promulgated. Our holding on this point makes it unnecessary for us to resolve the merits of petitioners’ alternative argument that the new recalibration adjustment, as embodied in the current version of 10 NYCRR 86-2.31, is itself arbitrary and capricious.
The only other issue remaining is whether respondents violated their own regulations in computing the rate for petitioner Jewish Home’s services. Under 10 NYCRR 86-2.8 (c), the facility’s utilization "[f]or reimbursement purposes” "shall be determined by using the higher of the minimum utilization factor of 90 percent of certified beds or the actual patient days of care as furnished by the facility.” We agree with the Appellate Division that there is no rational basis for segmenting petitioner’s facility into its two component parts— *266 a health-related facility and a skilled nursing facility — before making the determination contemplated by this regulation. The absence of a rational basis for this segmenting is highlighted by the fact that DOH requires that the actual utilization figures to be "furnished by the facility” under 10 NYCRR 86-2.8 (c) be calculated on the basis of the over-all occupation of the facility as a whole (10 NYCRR 86-2.2 [e]).
Accordingly, in both appeals, the order of the Appellate Division should be affirmed, with costs.

. For the subsequent history of NYSAC, see, 191 AD2d 932, Iv dismissed 82 NY2d 705, lv denied by App Div, Aug. 11, 1993.

. According to DOH’s brief, "[t]he 1987 and 1988 rates were recalculated with no recalibration adjustment for nursing homes that had timely challenged the former regulation”.

. The Appellate Division in Jewish Home modified the Supreme Court’s determination by dismissing as time-barred petitioner’s challenge to the application of the new recalibration rate to the years 1987 and 1988. That aspect of the Appellate Division’s decision is not at issue in this appeal.

. Contrary to the dissent’s assertion, our analysis and holding is not in any way based on our reading of this Court’s decision in NYSAC (78 NY2d 158, supra). In fact, we conclude, as the dissenters apparently do, that neither the holding nor the underlying judgment that we affirmed in NYSAC resolves the issue before us.

. Similarly flawed is the dissent’s effort to justify its conclusion by distinguishing between a "preexisting, approved facility reimbursement rate and a preexisting rate-making methodology” (dissenting opn, at 269) for purposes of applying Public Health Law § 2807 (7) (a). The distinction is artificial, since rates and the methodologies by which they are reached are inextricably intertwined. A methodology is simply the route by which the rate is reached, and where the methodology is established the rate amount necessarily follows. The artificiality of the distinction the dissent draws is particularly apparent here, where the invalidated regulation imposed an across-the-board 3.035% reduction on the rates the nursing homes would otherwise have received. Under those circumstances, it defies reality to suggest, as the dissent does, that after the invalidation of the initial recalibration regulation "there were no preexisting, prospectively set reimbursement rates which could have been reinstated.” (Dissenting opn, at 270.) The "pre-existing” reimbursement rate is easily identified: it is the rate that was to be used to calculate the 3.035% reduction. Indeed, the existence and vitality of that preexisting rate is evident from the postjudgment litigation in NYSAC, which the dissent cites. Following our Court’s decision in NYSAC (78 NY2d 158, supra), the successful plaintiff in that case made a motion to enforce its judgment, contending that DOH was precluded thereby from attempting to enforce its new recalibration rate retroactively against it. The Appellate Division, as well as the trial court that issued the judgment, agreed and found no difficulty in simply directing DOH to authorize payment after adding onto the base rate the 3.035% that had improperly been deducted (see, 191 AD2d 932).

. Notably, the United States Supreme Court has declined to adopt a virtually identical argument in connection with the Federal analogue of Public Health Law § 2807 (7) (a) (Bowen v Georgetown Univ. Hosp., 488 US 204, 213-215).