[608 NYS2d 720]

In the Matter of A. Holly Patterson SNF et al., Appellants,
v Mark R. Chassin, as Commissioner of the New York
State Department of Health, et al., Respondents.

Third Department, March 10, 1994

APPEARANCES OF COUNSEL

*Cadwalader, Wickersham & Taft,* New York City *(Jeffrey Q. Smith, Peter G. Bergmann, William J. Natbony* and *Gary J. Mennitt* of counsel), for appellants.

*G. Oliver Koppell, Attorney-General,* Albany *(Victor G. Paladino* and *Peter G. Crary* of counsel), for respondents.

## OPINION OF THE COURT

YESAWICH JR., J.

Petitioners, residential health care facilities participating in the Medicaid program, brought this proceeding challenging respondents' calculation of their Medicaid reimbursement rates for the period beginning July 1, 1992. In particular, petitioners maintain that respondents' modification of the peer grouping system used to calculate the amount reimbursed for indirect costs, assertedly made in response to the requirements of the Federal Omnibus Budget Reconciliation Act of 1987 and the New York courts' interpretation of those requirements *(see, Matter of Amsterdam Nursing Home Corp. v Commissioner of N. Y. State Dept. of Health,* 192 AD2d 945, lv denied 82 NY2d 654), was irrational, arbitrary and capricious.

The rates paid to participating facilities under the Medicaid program incorporate four separate components, one of which is intended to compensate the facility for its indirect costs, such as those incurred for administration, maintenance, food service and other general operating expenses not directly related to any individual patient's care. The applicable regulations provide that this amount is to be calculated, in part, by reference to the mean costs of similar facilities, those in the appropriate "peer group" *(see,* 10 NYCRR 86-2.10 [d] [2], [4], [5]). A facility is reimbursed at a rate based on its own 1983 costs *(see,* 10 NYCRR 86-2.10 [b] [1] [i]), trended forward to account for inflation, and with appropriate adjustments for changes that affect the cost of operation (e.g., addition of beds and changes in level of care), unless those adjusted costs are below the "base" price or above the "ceiling" price, amounts derived from the peer group mean. If a provider's adjusted

costs are below the base price, it will generally receive a rate derived from the full base price; this provides an incentive for facilities to operate as efficiently as possible. Conversely, and in keeping with the same rationale, if the adjusted costs are above the ceiling, reimbursement is based on the ceiling price *(see,* 10 NYCRR 86-2.10 [d] [4] [vi]).

In 1986, when the peer grouping methodology was adopted, facilities were divided into groups based on size (fewer than 300 beds, or 300 beds or more), affiliation (free-standing or hospital-based) and type of care (skilled nursing facility [hereinafter SNF] or health related facility [hereinafter HRF]). The mean price (and derivatively the base and ceiling prices) of each group was determined by summing the 1983 costs of those facilities that would have been in the group in 1983, and dividing by the total 1983 patient days of those facilities *(see,* 10 NYCRR 86-2.10 [d] [4] [i]).

Although the base and ceiling prices against which a facility's costs are measured in a given year are those of the group whose attributes correspond to those which the facility possesses in that year, the prices for each group are not modified when facilities "join" or switch groups. For example, if a free-standing SNF facility had 250 beds in 1983, its 1983 costs would have been included in the calculation of mean, base and ceiling prices for the small/free-standing/SNF group; if this hypothetical facility added 60 beds in 1987, its costs, from that point on, would be measured against the base and ceiling prices for the large/free-standing/SNF group. The prices of the two groups would not be changed, however, as they are based on the 1983 data.

In 1987, Congress enacted legislation mandating that Medicaid rates be determined without regard to a facility's SNF/HRF status, and respondent State Department of Health (hereinafter DOH) enacted several amendments to the pertinent regulations to conform with this requirement *(see,* 42 USC § 1396a [a] [13] [A]; *Matter of Amsterdam Nursing Home Corp. v Commissioner of N. Y. State Dept. of Health,* 192 AD2d 945, 945-946, *supra).* After certain aspects of these amendments were invalidated, because they impermissibly continued the use of the SNF/HRF distinction *(see, Matter of Trustees of Masonic Hall & Asylum Fund v Commissioner of N. Y. State Dept. of Health,* 193 AD2d 249, 252-253; *Matter of Amsterdam Nursing Home Corp. v Commissioner of N. Y. State Dept. of Health, supra,* at 946), DOH discarded the old peer groups and established new ones, still using 1983 cost

data in accordance with the regulatory criteria, but without reference to SNF/HRF status. This was accomplished by regrouping the facilities that were in existence in 1983 according to their size, affiliation and case-mix index—a new factor —and recalculating mean costs for these groups. Since July 1992, each participating facility's indirect reimbursement rate has been reckoned using the base and ceiling prices of the new group that matches the facility's current size, affiliation and case-mix index (a measure of the intensity of care provided).

Petitioners object to this recalculation, and in particular to respondents' failure to include in a given group—for purposes of arriving at the base and ceiling prices applicable to facilities with like group characteristics—those facilities that began operation or changed their status (as by adding beds) after 1983. Petitioners claim that the effect of the regrouping has been to decrease the mean costs, and therefore the base and ceiling prices, of the groups into which they currently fall— and therefore to decrease their reimbursement rates—without a rational basis for doing so. Supreme Court rejected this claim and petitioners appeal.

■ A petitioner attempting to challenge the reasonableness of rate-setting action bears the burden of demonstrating that the adopted methodology is without a rational basis (*see, New York State Assn. of Counties v Axelrod,* 78 NY2d 158, 166; *Matter of New York Univ. Med. Ctr. v Axelrod,* 188 AD2d 207, 210, *lv denied* 81 NY2d 711); petitioners, whose primary contention is that respondents have acted counter to the provisions of the governing regulations, have failed to carry this burden.

Because the regulation at issue states that the peer group prices are to be calculated on the basis of reported allowable costs "for each facility" in the group (10 NYCRR 86-2.10 [a] [2]; [d] [4] [i]), petitioners argue that this necessarily includes all facilities now in existence having the group's characteristics. This assertion merely begs the question of which facilities are properly considered to be "in the group" for this purpose. The remainder of the regulation, however, furnishes the answer, for it clearly mandates the use of 1983 data for calculating peer group mean prices, making it not unreasonable to conclude, as respondents have, that the data to be used is to be derived from facilities whose characteristics would have placed them in the group in 1983. Although petitioners contend that respondents should have "de-trended" and utilized more current data from facilities that were not in operation in

1983, there is nothing irrational about respondents' decision to compute the group mean prices using only the costs of those facilities for which actual data is available from 1983.* In fact, this method is exactly the same as that utilized from the inception of the peer group-based system.

■ Petitioners also contend that the peer group recalculation was arbitrary, in that it included within a given peer group (e.g., an "over 300 bed" group) those facilities that had "become members" of that group as a result of the decision in *Matter of Amsterdam Nursing Home Corp. v Commissioner of N. Y. State Dept. of Health (supra)* (i.e., because their HRF and SNF beds can no longer be considered separately), but not other facilities that had "become members" of the group for other reasons, such as by adding beds since 1983. This argument fails to recognize the key distinction between these two types of facilities: the former meet the criteria of a new group because *the group criteria* have changed, and the peer group's attributes as redefined now match the attributes possessed by the facility in 1983, while the latter, although they may currently meet the new criteria because of changes between 1983 and the present, did not meet those criteria in 1983.

■ The fallacy of petitioners' argument is further demonstrated by the fact that no facility, not in operation in 1983, has had its cost data incorporated into a peer group mean; this applies to those of the *Amsterdam* petitioners that were not in existence in 1983, but whose rates are currently computed with reference to the group which they "joined" as a result of the abolition of the SNF/HRF distinction, as well as to those petitioners that were not operating in 1983. Thus, it cannot fairly be argued that the incorporation of a facility's data into the calculation of the mean for a given group is predicated on that facility's becoming a member of the group as a result of the *Amsterdam* decision. No facilities have been included in the calculations on the basis of post-1983 events.

As aptly noted by Supreme Court, petitioners' arguments reduce to the proposition that because they are currently reimbursed at a lower rate than prior to the regrouping, that change must have been arbitrary and irrational. They have not, however, demonstrated how the new methodology—which

---

* Nor does the fact that respondents have used 1985 case-mix data, for the purpose of placing facilities in groups to determine peer group prices, compel a different result. Use of the later data is mandated by the complete absence of case-mix data for 1983. This in no way renders irrational respondents' reliance upon 1983 data when it is available.

appears to be essentially similar to the old, except for the fact that it uses slightly different criteria for grouping providers in an attempt to satisfy the new Federal criteria—is unreasonable, and thus their challenge must fail.

■ Finally, we reject petitioners' suggestion that respondents' failure to provide for administrative review of methodology changes, such as that challenged herein, has deprived them of due process of law *(see, New York State Assn. of Counties v Axelrod,* 156 AD2d 14, 17-18, *revd on other grounds* 78 NY2d 158, *supra),* or that respondents were required to promulgate new rules in accordance with the dictates of the State Administrative Procedure Act to effectuate these changes.

MIKOLL, J. P., MERCURE and CREW III, JJ., concur.

Ordered that the judgment is affirmed, without costs.