[677 NYS2d 194]

St. Joseph's Hospital Health Center, et al., Respondents, v Department of Health of State of New York et al., Appellants, and Beth Israel Medical Center et al., Intervenors-Appellants. (Appeal No. 1.)

Fourth Department, July 8, 1998

## APPEARANCES OF COUNSEL

*Dennis C. Vacco, Attorney-General,* Albany (*Peter Crary* and *Victor Paladino* of counsel), for Department of Health of State of New York, appellants.

*Whiteman, Osterman & Hanna,* Albany (*John J. Henry, Jr.,* of counsel), for Beth Israel Medical Center and others, intervenors-appellants.

*Costello, Cooney & Fearon, L. L. P.,* Syracuse (*Frances Ciardullo* of counsel), for St. Joseph's Hospital Health Center and others, respondents.

*Rosenman & Colin, L. L. P.*, New York City (*Joseph V. Wil-ley* of counsel), for New York City Health and Hospitals Corporation, respondent.

*Nixon, Hargrave, Devans & Doyle, L. L. P.*, Garden City (*Thomas D'Antonio* of counsel), for remaining respondents.

### OPINION OF THE COURT

BALIO, J.

Plaintiffs in these two appeals consist of 39 general hospitals in locations throughout the State of New York who seek a judgment declaring that a portion of the regulation promulgated by respondent Department of Health of the State of New York (DOH) regarding Medicaid hospital reimbursement for bad debts and the costs of charity care (BDCC) (10 NYCRR 86-1.11 [g] [7]; [p] [7]) is unconstitutional and contrary to the enabling statutes (Public Health Law § 2807-a [8] [e]; § 2808-c [4] [e]) and that DOH's implementation of that regulation is arbitrary and capricious and contrary to law.[1] Plaintiffs also seek to enjoin permanently further implementation of that portion of the regulation at issue and to be reimbursed moneys previously recouped from them by the State pursuant to that regulation.

■ These appeals are from judgments (each denominated "order and judgment") of Supreme Court granting plaintiffs' motions for summary judgment, declaring that portion of the regulation invalid, permanently enjoining DOH from implementing the regulation and directing DOH to reimburse plaintiffs for moneys previously recouped. We conclude that the regulation is valid and enforceable and that, with two exceptions, the court erred in concluding that DOH improperly implemented the regulation.

### FACTUAL BACKGROUND

After undertaking a comprehensive study of various hospital financing mechanisms, in 1980 the Council on Health Care Financing (Council) submitted to the Governor and Legislature its recommendations for the financing of hospital inpatient

---

1. One action was commenced by St. Joseph's Hospital Health Center and 37 other plaintiffs, who will be collectively referred to as the "St. Joseph's plaintiffs" (appeal No. 1). The other action was commenced by New York City Health and Hospitals Corporation (HHC) (appeal No. 2). Many of the issues raised in each appeal are identical. Where a different issue is raised, we will refer to the parties as HHC or the St. Joseph's plaintiffs. In addition, the phrase "bad debt and charity care" also will be referred to herein as BDCC.

care. Based upon the Council's recommendations, the Legislature enacted Public Health Law § 2807-a (now § 2808-c), adopting the New York Prospective Hospital Reimbursement Methodology (NYPHRM I) for reimbursing general hospitals for the cost of providing inpatient care under the Medicaid program during rate years 1983, 1984 and 1985 (see, L 1982, ch 536). Historically, hospitals attempted to recoup losses sustained in BDCC cases by increasing the medical rate charged to paying patients. In order to discourage hospitals from "passing on" their BDCC to those patients who could afford to pay, NYPHRM I included a methodology for raising money to reimburse general hospitals for the financial burden incurred in providing care to patients unwilling or unable to pay for their care. Essentially, NYPHRM I authorized the Commissioner of Health of the State of New York (Commissioner) to certify an inpatient revenue cap, i.e., the maximum amount that a hospital could receive for providing inpatient services. Each general hospital was required to add on to the allowable rates charged to third-party payors, including Medicare, Medicaid, Blue Cross and other private insurers, a percentage of its inpatient care rate. When third-party payors paid an inpatient's account, the money representing the add-on charge was placed in the BDCC pool of funds for the region in which the hospital was located.

Eight regions were established, and within each region, general hospitals were divided into two sectors: (a) major public hospitals and (b) voluntary nonprofit, private proprietary, and public general hospitals other than major public hospitals.[2] Money generated by the add-on charge to inpatient care rates for each general hospital was deposited in the regional BDCC pool in the region where the hospital was located. NYPHRM I required DOH to determine each hospital's reimbursement rate for inpatient services provided to BDCC patients prospectively based upon an established base year. For example, each hospital's BDCC reimbursement rate for 1983 was determined by the amount of the hospital's BDCC need during the base year 1981, and each hospital was notified of that rate at least 60 days before the start of 1983. NYPHRM I further provided for the distribution of regional BDCC pool funds pursuant to the established reimbursement rate.

---

**2.** Major public general hospitals include all State-operated general hospitals, all general hospitals operated by the New York City Health and Hospitals Corporation, and all other public general hospitals having annual inpatient operating costs in excess of $25 million (Public Health Law § 2808-c [4]).

NYPHRM I also included an additional component, commonly referred to as "maintenance of effort" (MOE), within the BDCC reimbursement methodology. MOE is designed to encourage each general hospital to "maintain[ ] its effort * * * of providing care to those unable or unwilling to pay for care" and to discourage each hospital from shifting the BDCC burden to other hospitals within the area or region by authorizing the DOH to reallocate the regional BDCC pool funds if it finds that there has been a change in the proportional amount of the BDCC need provided by the hospitals. Public Health Law § 2808-c (4) (e) (also referred to as the MOE statute) authorizes such a reallocation, as follows: "An annual review shall be conducted pursuant to rules and regulations adopted by the [C]ouncil and approved by the [C]ommissioner with respect to [BDCC] need within each * * * region * * *. If within such a region there is a definitive finding as a result of such review that there has been a change in the proportional amounts of [BDCC] provided by (i) major public general hospitals and (ii) voluntary non-profit, private proprietary and public general hospitals, other than major public general hospitals, the allocation of resources made available under this paragraph shall be adjusted pursuant to the rules and regulations adopted pursuant to this paragraph so as to reflect this change." In 1982, the Commissioner promulgated a regulation that essentially mirrored the above-quoted statutory provision. In 1984, the Commissioner promulgated 10 NYCRR 86-1.11 (g) (7), which includes the methodology for computing the MOE reallocation for rate years 1983, 1984 and 1985. Essentially, the MOE methodology authorized DOH to recoup a portion of the BDCC funds previously distributed to those hospitals that did not maintain their efforts with respect to BDCC cases and redistribute those funds to hospitals that maintained their effort in providing such care.

Prior to rate year 1986, DOH had the authority to establish Medicare reimbursement rates pursuant to an agreement with the Federal Government. Because that agreement expired at the end of 1985, DOH could not impose an add-on to the inpatient rate for Medicare patients after rate year 1985 to fund the regional BDCC pools. With respect to the BDCC reimbursement methodology, the Legislature revised NYPHRM I to impose an assessment on gross revenues of general hospitals (see, L 1985, ch 807, § 4). That assessment replaced the charge added on to the Medicare rates, and the funds generated by the assessment were placed in a State-wide

BDCC pool. With respect to other third-party payors, the revised New York Prospective Hospital Reimbursement Methodology (NYPHRM II) continued the procedure of add-ons to the inpatient care rates as a means of funding the regional BDCC pools. NYPHRM II, which applied to rate years 1986 and 1987, contains language identical to NYPHRM I in authorizing MOE reallocations for each rate year (*see,* Public Health Law § 2807-a [8] [e]). The Commissioner promulgated a revised MOE regulation, which set forth the base year that would be used with respect to each rate year but otherwise continued the MOE reallocation methodology (10 NYCRR 86-1.11 [p] [7]).

Prior to 1994, DOH circulated draft MOE reallocation calculations with the Hospital (now Healthcare) Association of New York State and certain other provider groups and asked that the draft calculations be shared with member facilities for review, verification and comment. In January 1994, DOH advised each general hospital of the MOE reallocation calculations for rate years 1983 through 1987 and asked each hospital to report any errors to DOH. Some facilities did report errors in data to DOH and corrections were made. In June 1994, DOH commenced the reallocation process by recouping funds from those hospitals that, according to the MOE calculations, had failed to maintain their BDCC need efforts pursuant to the 1984 MOE regulation (10 NYCRR 86-1.11 [g] [7]) and revised MOE regulation (10 NYCRR 86-1.11 [p] [7]).

In these actions, plaintiffs challenge the validity of the MOE regulations and also contend that the conduct of DOH in implementing the MOE reallocation process was arbitrary and capricious.

CONSTITUTIONALITY AND VALIDITY
OF MOE REGULATIONS:
"RETROACTIVE RATE-MAKING"

█ Public Health Law § 2807 (7) requires the Commissioner to notify each hospital of the approved reimbursement rate "at least sixty days prior to the beginning of an established rate period for which the rate is to become effective" and, thus, prohibits retroactive rate-making (*see, Matter of Jewish Home & Infirmary v Commissioner of N. Y. State Dept. of Health,* 84 NY2d 252, 260). Plaintiffs contend, and Supreme Court agreed, that the 1984 MOE regulation is unconstitutional and invalid because the regulation retroactively establishes the amount of reimbursement for rate years 1983 and 1984 in violation of Public Health Law § 2807 (7). We disagree. The reallocation ef-

fected by the 1984 MOE regulation does not constitute retroactive rate-making. The initial BDCC allocation, which is part of the reimbursement rate for inpatient services of each general hospital for the rate years 1983 and 1984, was established prior to each rate year based upon the amount of the hospital's BDCC need as indicated by each hospital's financial and statistical data for base year 1981.[3] Funds were distributed from the regional BDCC pools to general hospitals in accordance with the established rate. The reallocation scheme implemented by the 1984 MOE regulation does not set the reimbursement rate; it is an adjustment of the rate based upon the effort of each hospital in maintaining its level of inpatient services provided to BDCC patients during the rate year. Adjustments to an established rate that are contemplated by the statutory reimbursement scheme do not constitute impermissible retroactive rate-making (*see, Tioga Nursing Home v Axelrod*, 90 AD2d 570, 571, *affd* 60 NY2d 717).

Moreover, the 1984 MOE regulation did not operate retroactively. The regulation was promulgated on March 29, 1984. Because each hospital is not required to submit its financial and statistical data regarding the cost of providing inpatient services until the first of May of the year following the rate year (*see*, 10 NYCRR 86-1.3), DOH could not begin the process of conducting an annual review to determine whether a reallocation is warranted for rate year 1983 until after May 1, 1994, and no step in the reallocation process was undertaken until well after promulgation of the 1984 MOE regulation.

### VALIDITY OF MOE REGULATION: REALLOCATION BASED ON CHANGES IN HOSPITAL NEED FOR BDCC

The 1984 MOE regulation defines hospital need for BDCC as "the sum of inpatient bad debts, charity care, and outpatient deficits" (10 NYCRR 86-1.11 [g] [3]) and provides that reallocations be made based upon the change, if any, in the proportion of BDCC need met by each hospital and sector (10 NYCRR 86-1.11 [g] [7] [ii] [a]—[i]). The revised MOE regulation that applies to rate years 1986 and 1987 includes the same definition and reallocation methodology.

The St. Joseph's plaintiffs contend that reallocating regional BDCC pool funds based on "need" is contrary to statutory mandates that the funds be reallocated based on "a change

---

3. In the case of hospitals in the voluntary sector, the allocation for 1984 was determined by the financial and statistical data of BDCC need for rate year 1982 (*see*, 10 NYCRR 86-1.11 [g] [5]).

in the proportional amounts of [BDCC] *provided*" (Public Health Law § 2807-a [8] [e]; § 2808-c [4] [e] [emphasis added]). They contend that, in promulgating a regulation authorizing reallocation based on changes in need, rather than BDCC services provided, the Commissioner exceeded his statutory authority, and thus the regulation must be declared invalid. Those plaintiffs contend that there is a substantive difference between the terms "need" and "provided" because "need" includes outpatient deficits but the amounts of BDCC "provided" do not. Again, we disagree.

NYPHRM I and NYPHRM II provide that the allocation of regional BDCC pool funds may be changed only if DOH conducts "[a]n annual review * * * pursuant to rules and regulations adopted by the [C]ouncil and approved by the [C]ommissioner with respect to [BDCC] *need* within each * * * region * * *. If within such a region there is a definitive finding as a result of such review that there has been a change in the proportional amounts of [BDCC] *provided* * * * the allocation of resources made available under this paragraph shall be adjusted pursuant to the rules and regulations adopted pursuant to this paragraph so as to reflect this change" (Public Health Law § 2807-a [8] [e]; § 2808-c [4] [e] [emphases added]). We reject the contention of the St. Joseph's plaintiffs[4] that NYPHRM I and NYPHRM II are clear and unambiguous insofar as they appear to require definitive findings based on proportional changes in BDCC services provided and that the regulation is invalid because it requires findings based on changes in BDCC need. Because the object of the annual review is BDCC "need" and the definitive findings must be based upon the annual review, the meaning of the word "provided" is unclear; BDCC services "provided" is not the subject of the annual review and could not be the basis of the definitive finding mandated by the statutes. We cannot construe the statutory provisions to reach such an inconsistent result (*see, Gembala v Audobon Assn.*, 97 AD2d 345, 347). We agree with HCC and defendants that the statutory language should be construed to require definitive findings based upon proportional changes in BDCC need provided and that the MOE regulation is, therefore, consistent with the statutory mandate.

---

4. HHC disagrees with the position of the St. Joseph's plaintiffs and maintains that the 1984 MOE regulation and the revised MOE regulation for rate years 1986 and 1987 properly provide for definitive findings and reallocations based upon proportional changes in BDCC need.

■ HHC[5] contends that, in promulgating the 1984 MOE regulation (10 NYCRR 86-1.11 [g] [7]), the Commissioner also exceeded his statutory authority in authorizing a reallocation based upon a percentage change in BDCC need, rather than an actual change in need. NYPHRM I authorizes a reallocation based upon a "change in the proportional amounts of [BDCC]" need provided by general hospitals (Public Health Law § 2808-c[4] [e]). It is important to recall that the MOE regulations were adopted by the Council, which proposed NYPHRM I for the Legislature's consideration, and were approved by the Commissioner. Based on the involvement of the Council in the development of NYPHRM I and the knowledge of the Council and DOH of the methodology involved in the operational practices of allocating and reallocating BDCC pool funds, we should defer to their interpretation of the statute. They are the agencies responsible for development and administration of the statute, and their interpretation is not unreasonable or irrational (*see, Matter of Jennings v New York State Off. of Mental Health*, 90 NY2d 227, 239; *Matter of Home Care Assn. v Bane*, 218 AD2d 106, 109, *lv denied* 87 NY2d 808).

### VALIDITY OF MOE REGULATIONS: INTRASECTOR REALLOCATIONS

■ NYPHRM I and NYPHRM II provide that, "[i]f within * * * a region there is a definitive finding * * * that there has been a change in the proportional amounts of [BDCC] provided by (i) major public general hospitals and (ii) voluntary non-profit, private proprietary and public general hospitals, other than major public general hospitals, the allocation of resources made available under this paragraph shall be adjusted * * * so as to reflect this change" (Public Health Law § 2807-a [8] [e]; § 2808-c [4] [e]). The 1984 MOE regulation promulgated pursuant to Public Health Law § 2808-c provides: "After a reallocation of funds between sectors has been made * * * a second reallocation of funds within the sector for which the increase in proportion was found shall be made if one or more hospitals in this sector is found * * * to have decreased its proportion by two percent or more" (10 NYCRR 86-1.11 [g] [7] [ii] [h]). The regulation further provides that, "[i]f there is no reallocation of funds between sectors pursuant to this paragraph, a realloca-

---

**5.** HHC also contends that the 1984 MOE regulation, in basing its reallocation on need figures not reduced to cost, contravenes NYPHRM I (Public Health Law § 2808-c). We need not address that issue. HHC concedes that the issue was not decided by Supreme Court, and it has not appealed from the judgment.

tion of funds within one or both sectors in any region shall be made pursuant to the methodology for the second reallocation contained in clause (*h*) of this subparagraph" (10 NYCRR 86-1.11 [g] [7] [ii] [*i*]). The same reallocation process is continued under the revised MOE regulation applicable to rate years 1986 and 1987 (*see,* 10 NYCRR 86-1.11 [p] [7]). Plaintiffs contend that the MOE regulations are invalid insofar as they permit intrasector reallocation; they contend that NYPHRM I and NYPHRM II are unambiguous in this respect and permit only intersector reallocation, i.e., reallocation of BDCC funds between the public and private sectors. We disagree.

Neither NYPHRM I nor NYPHRM II uses the term "between" or "intersector reallocation". Further, neither statute may be read to limit reallocations to intersector changes in BDCC need. The statutes simply require a reallocation of regional BDCC pool funds within each region if there has been a proportional change in BDCC need provided by major public hospitals and private hospitals. Thus, with respect to intersector and intrasector reallocation, the statutes are ambiguous. For the same reasons expressed above, we should defer to the interpretation of the Council and Commissioner (*see, Matter of Jennings v New York State Off. of Mental Health, supra,* at 239; *Matter of Home Care Assn. v Bane, supra,* at 109). The interpretation of the Council and Commissioner, as reflected in the MOE regulations, is consistent with legislative intent and the policy underlying the concept of maintenance of effort. The Chairman of the Senate Committee on Health, in urging the Governor to approve NYPHRM I, stated that "[e]ligibility for the [BDCC pool] funds would be dependent upon the efforts of *each facility* to obtain payment from those whom it serves and the continuity of effort in providing services to patients unable or unwilling to pay" (July 8, 1982 Letter from Sen. Tarky Lombardi, Jr. to Hon. John G. McGoldrick, Bill Jacket, L 1982, ch 536 [emphasis added]). The purpose of the maintenance of effort component of NYPHRM I and NYPHRM II is to discourage a hospital from shifting the burden of providing BDCC to another hospital. Reallocating BDCC pool funds only between sectors would not accomplish that purpose. It would not discourage private hospitals from shifting the BDCC burden to other private hospitals. Further, in those regions without a major public hospital, such as the Utica region, there would be no reallocation at all. Hospitals in those regions, therefore,

would be treated differently from hospitals in regions that included a major public hospital. The interpretation of the Council and DOH authorizing intrasector reallocation is not precluded by NYPHRM I or NYPHRM II and is consistent with the legislative purpose of MOE. Thus, the decision to include intrasector reallocation is not irrational and should be upheld (*see, Matter of Memorial Hosp. v Axelrod*, 68 NY2d 958, 960; *Matter of Howard v Wyman*, 28 NY2d 434, 438, *rearg denied* 29 NY2d 749; *Matter of Thomas v Dosberg*, 249 AD2d 999).

### IMPLEMENTATION OF MOE: ANNUAL
### REVIEW AND DEFINITIVE FINDINGS

Public Health Law § 2807-a (8) (e) (NYPHRM II) and § 2808-c (4) (e) (NYPHRM I) provide that the allocation of regional BDCC pool funds may be changed, i. e., reallocated, only if an annual review is conducted pursuant to rules and regulations promulgated by the Commissioner and if, based upon that review, there is a definitive finding that, within a region, there has been a change in the proportional amounts of BDCC provided by the general hospitals. The 1984 MOE regulation (10 NYCRR 86-1.11 [g] [7]) and revised MOE regulation (10 NYCRR 86-1.11 [p] [7]) promulgated pursuant to NYPHRM II mirror the statutory language.

■ Plaintiffs contend that, because DOH never conducted an annual review nor made definitive findings with respect to the rate years 1983 through 1987, the reallocation determinations made by DOH in 1994 with respect to those rate years are invalid and arbitrary and capricious. We conclude that DOH made the requisite annual reviews and definitive findings contemplated by the statutes and regulations.

There is no requirement that the reviews be conducted annually, e.g., that the review of rate year 1983 be performed in 1984. The Council and Commissioner conclude that the annual review requirement is satisfied by conducting a separate review for each rate year once adequate data essential to such a review becomes available (*see*, 10 NYCRR 86-1.11 [g] [7] [ii] [*c*]). Further, the statutes do not specify the form or manner in which definitive findings must be made. DOH disseminated data in 1994 to each hospital showing proportional changes for each rate year in the amount of BDCC provided by that hospital and other hospitals in the region as well as proportional

changes between the public and private hospital sectors. Although not labeled "definitive findings", we conclude that such data constitutes the definitive findings required by the statutes and regulations. Indeed, that point was conceded by the general hospitals who were plaintiffs in *Matter of Arnot-Ogden Med. Ctr. v Chassin* (229 AD2d 833, 836, *lv denied* 89 NY2d 801). In the absence of any definitions for the terms "annual review" and "definitive findings" in the legislation or regulations and given the complexity of the Medicaid hospital reimbursement program and DOH's experience in implementing that program, we should defer to the interpretation of those terms by DOH, the agency empowered to administer the program (*see, Matter of Jennings v New York State Off. of Mental Health, supra,* at 239; *Matter of Home Care Assn. v Bane, supra,* at 109). In the circumstances of this case, DOH's interpretation of those terms is not irrational. The data shows that DOH conducted a review of BDCC need provided by each hospital for each rate year, and the data, in its published form, reveals definitive findings of proportional changes in the levels of BDCC need provided by the hospitals in various regions for each rate year. Although plaintiffs maintain that the failure of DOH to respond to Freedom of Information Law requests and discovery demands for production of definitive findings establishes that no such findings exist, we conclude that the failure of DOH to respond is attributable to its position that there is no discrete document entitled "definitive findings" and does not constitute a concession that such findings do not exist.

IMPLEMENTATION OF MOE:

THE CLAIM OF DELAY

■ We reject the contention of the St. Joseph's plaintiffs that, because DOH delayed implementation of MOE reallocation for 10 years, the court properly enjoined permanently the reallocation of BDCC funds for rate years 1983 through 1987. DOH maintains that it delayed implementation of the MOE reallocation because it wanted to base its calculations on audited data. DOH contends that, if it used unaudited data, it would need to revise the reallocation once the audited data became available. NYPHRM I, NYPHRM II and the MOE regulations contain no time limit for the implementation of MOE reallocations. Thus, the timing of implementation of that process is within the agency's discretion (*see, Matter of Arnot-Ogden Med. Ctr. v Chassin, supra,* at 836), and the mere pas-

sage of time is insufficient to warrant judicial intervention in the administrative process (see, *Matter of Diaz Chem. Corp. v New York State Div. of Human Rights*, 91 NY2d 932, 933; *Matter of Harris & Assocs. v deLeon*, 84 NY2d 698, 702; *Matter of Cortlandt Nursing Home v Axelrod*, 66 NY2d 169, 177-178, *rearg denied* 66 NY2d 1035, *cert denied* 476 US 1115).

Judicial intervention is unwarranted unless it is established that a party has been substantially prejudiced by the delay (see, *Matter of Cortlandt Nursing Home v Axelrod, supra*, at 180). The conclusory assertions of prejudice by the St. Joseph's plaintiffs fail to raise a triable issue of fact (see, *Matter of Sylcox v Chassin*, 227 AD2d 834, 835). There is no merit to their contention that they cannot challenge DOH's interpretation of NYPHRM I and NYPHRM II as reflected in the 1984 MOE regulation because documents relating to the adoption of that regulation either are in long-term storage or have been destroyed. The request for those documents was made in 1994. The St. Joseph's plaintiffs could have mounted a challenge to the 1984 MOE regulation in 1984 but did not do so. There is no proof that the documentation was unavailable in 1984 or for a reasonable period thereafter. Thus, the St. Joseph's plaintiffs have failed to establish that any prejudice resulting from the absence of such documentation is attributable to the delayed implementation of MOE reallocation. Also without merit is the contention that potential witnesses are unavailable to testify. Although several former financial officers have left their positions, there is no proof that those witnesses are unavailable or that the testimony of the one deceased former financial officer is critical to mounting a challenge to the MOE reallocation (see, *Matter of Cortlandt Nursing Home v Axelrod, supra*, at 180-181; *Matter of Sylcox v Chassin, supra*, at 835). We also reject the contention that, because data submitted by the hospitals is unavailable, the St. Joseph's plaintiffs are thereby precluded from challenging the accuracy of reallocation calculations. The assertion by some hospitals that they have destroyed source documents relevant to data submitted to DOH fails to demonstrate that they are unable to contest the calculations by DOH. For example, the record does not establish whether the data reports of those hospitals have been audited. As previously noted, the conclusory assertion that the source documents of other hospitals may have been destroyed is insufficient to raise a triable issue of fact.

IMPLEMENTATION OF MOE:
ERRONEOUS CALCULATIONS

The St. Joseph's plaintiffs contend that the MOE reallocation for each of the rate years 1983 through 1987 is arbitrary and capricious because it is based on erroneous data or was erroneously calculated. Specifically, they contend that certain reallocations are invalid because some hospitals received more than 100% of BDCC need, in violation of 10 NYCRR 86-1.11 (g) (7) (ii) (j); that many hospitals have closed and permanently terminated operations, thereby making it impossible to recoup "overpayments" from them or to reallocate funds to them; and that the data supplied by many of the hospitals is, in various degrees, inaccurate, thereby creating a fundamental flaw in the reallocation process.

▄ We agree that DOH, in reallocating BDCC pool funds, improperly reimbursed certain hospitals more than 100% of their BDCC need, in violation of the 1984 MOE regulation. That error, however, can be remedied by recouping the amount of overpayment and revising the reallocation made to other hospitals. The fact that several hospitals have terminated operations is inherent in the reallocation process. The St. Joseph's plaintiffs have not shown that the exclusion of the defunct institutions from the reallocation process will result in a shortfall in the funds to be redistributed to general hospitals who have maintained their BDCC effort. Further, those plaintiffs have not shown that they will be prejudiced by having to provide additional moneys to eliminate the shortfall, or that there is a significant difference between the amount to be recouped from and the amount to be redistributed to defunct hospitals. In this regard, we note that the MOE reallocation program has a built-in procedure for redistributing any funds remaining after the MOE reallocation is completed (*see,* 10 NYCRR 86-1.11 [g] [7] [ii] *[jj]*). DOH completed the MOE reallocation calculations based, in some instances, on unaudited data or corrected data in order to prevent further delay in the actual reallocation. The St. Joseph's plaintiffs have failed to establish that, to the extent that DOH was required as a practical matter to rely upon some data that was erroneous or unaudited, such data will produce an unreasonable reallocation or that the entire process is so fundamentally flawed as to be arbitrary and capricious (*see, Matter of New York Assn. of Homes & Servs. for Aging v Commissioner of N. Y. State Dept. of Health,* 87 NY2d 978, *revg* 212 AD2d 163 *on dissents of Crew,*

*J.*, at 170-172 *and Casey, J.*, at 172; *Matter of New York Tel. Co. v Public Serv. Commn.*, 98 AD2d 535, 538).

■ There is no merit to the contention of the St. Joseph's plaintiffs that they have a due process right to the finality of the initial BDCC distributions that they received. There is no protected property interest in those Medicaid payments that may be adjusted at a later time, either as the result of an audit or a statutory adjustment to the rate (*see, Matter of Sylcox v Chassin, supra*, at 835; *Grossman v Axelrod*, 646 F2d 768, 771).

Also without merit is the contention of the St. Joseph's plaintiffs that they have been denied procedural due process. DOH notified each hospital in January 1994 of the data to be utilized in the MOE reallocation computations and requested each hospital to inform it of any errors in that data. Some hospitals did report errors and corrections were made. Administrative review is not necessary when the methodology itself or the promulgation of a regulation has been challenged (*see, Matter of Montefiore Med. Ctr. v Chassin*, 203 AD2d 685, 686, *lv denied* 84 NY2d 802; *Matter of A. Holly Patterson SNF v Chassin*, 196 AD2d 155, 161, *appeal dismissed and lv denied* 83 NY2d 962), and the availability of CPLR article 78 review to challenge the actual reallocation satisfies due process requirements (*see, Interboro Inst. v Foley*, 985 F2d 90, 93-94).

NYPHRM II, which applies to rate years 1986 and 1987, provides for the establishment of a State-wide BDCC pool and the distribution of State-wide BDCC pool funds to public and voluntary private general hospitals in the same manner as regional BDCC pool funds, i.e., to major public general hospitals first and then to voluntary private hospitals. NYPHRM II, however, does not authorize a reallocation of State-wide BDCC pool funds based on maintenance of effort (*see*, Public Health Law § 2807-a [8] [e]; [16] [a]; [24] [a]). Moreover, the regulations promulgated by the Commissioner pursuant to section 2807-a do not authorize a reallocation of State-wide BDCC pool funds (*see*, 10 NYCRR 86-1.11 [p] [7]; [u]). Nevertheless, DOH reallocated State-wide BDCC pool funds for the rate years 1986 and 1987 in the same manner that it reallocated regional BDCC pool funds.

DOH contends that its interpretation of section 2807-a (NYPHRM II) and its decision to reallocate State-wide BDCC pool funds were proper because (a) the reallocation of State-wide BDCC pool funds furthers the Legislature's intent in creating the State-wide pool; (b) the failure to reallocate the State-wide BDCC pool funds would contravene Public Health Law § 2807-a (25), which provides that "[n]o general hospital may receive in total from the distributions made [from State-wide and regional BDCC pool funds] an amount which exceeds its need for financing losses related to [BDCC]"; and (c) plaintiffs failed to establish that, given DOH's broad delegation of power to implement BDCC reallocations and the level of deference accorded DOH in interpreting section 2807-a, the interpretation of the statute and the decision of DOH to reallocate State-wide BDCC pool funds are not irrational. We disagree.

Where, as here, the statute is unambiguous, it is inappropriate to defer to the agency's interpretation (*see, Matter of Raritan Dev. Corp. v Silva*, 91 NY2d 98, 102-103; *Doctors Council v New York City Employees' Retirement Sys.*, 71 NY2d 669, 674-675). Moreover, the interpretation of the agency is contrary to its own regulations, which do not authorize a reallocation of State-wide BDCC pool funds. An agency acts arbitrarily and capriciously when it fails to conform to its own regulations (*see, Matter of Law Enforcement Officers Union v State of New York*, 229 AD2d 286, 291, *lv denied* 90 NY2d 807; *Matter of Church v Wing*, 229 AD2d 1019, 1020). "The failure of the Legislature to include a matter within a particular statute is an indication that its exclusion was intended" (*Pajak v Pajak*, 56 NY2d 394, 397). It is not for this Court or DOH to legislate by supplying an omission that would effectively broaden the scope and application of the statute (*see, Matter of Raritan Dev. Corp. v Silva, supra*, at 107; *Eastern Paralyzed Veterans Assn. v Metropolitan Transp. Auth.*, 79 AD2d 516, 517, *appeal dismissed* 52 NY2d 895). Even if we assume that reallocation of State-wide BDCC pool funds is consistent with the policy underlying the MOE statute and that the failure of the Legislature to authorize the reallocation of State-wide BDCC pool funds was an oversight, "if any unsought consequences result, the Legislature is best suited to evaluate and resolve them" (*Bender v Jamaica Hosp.*, 40 NY2d 560, 562).

Thus, we conclude that, because the MOE statute and regulations do not authorize reallocation of State-wide BDCC pool

funds, the court properly concluded that the determination of DOH to reallocate those funds exceeded the agency's powers and was arbitrary and capricious. However, neither the improper reallocation of State-wide BDCC pool funds nor the improper distribution to a hospital of more than 100% of its BDCC need warrants the issuance of an injunction permanently restraining implementation of the MOE reallocation scheme. Those improprieties may be corrected by a remittal to the agency with the direction that the agency recalculate the amount of funds to be reallocated to each general hospital consistent with this opinion (*see, Matter of Society of N. Y. Hosp. v Axelrod*, 70 NY2d 467, 475).

### CONCLUSION

Accordingly, each judgment should be modified by vacating the permanent injunction and all prior orders of restraint, by granting judgment in favor of defendants declaring that the MOE regulations are constitutional and valid, by vacating the direction that the State reimburse plaintiffs for moneys previously recouped pursuant to those regulations, and by granting summary judgment in favor of defendants on the remaining issues except with respect to the reallocation of State-wide BDCC pool funds and the determination that reallocation of regional BDCC pool funds to a hospital in excess of 100% of its BDCC need is invalid. With respect to those exceptions, each judgment should be further modified by directing DOH to recalculate and redistribute the reallocations for 1983-1987 so that no hospital receives in excess of 100% of its BDCC need and by directing DOH to recalculate and redistribute the reallocations for 1986-1987 without including moneys in the State-wide BDCC pool.

DENMAN, P. J., LAWTON, WISNER and BOEHM, JJ., concur.

Judgment unanimously modified, on the law, and as modified, affirmed, *without costs, in accordance with* the opinion by BALIO, J.