■ In the Matter of UCP-BAYVIEW NURSING HOME, Appellant-Respondent, v ANTONIA C. NOVELLO et al., Respondents-Appellants. [769 NYS2d 285]—

In a hybrid proceeding pursuant to CPLR article 78, inter alia, to review a determination of Antonia C. Novello and Richard Pellegrini dated June 14, 2001, which reduced a component of the petitioner's Medicaid reimbursement rate following an audit, and an action for a judgment declaring that the guideline of the New York State Department of Health for designating a diagnosis of "quadriplegia" on a patient review instrument is invalid, the petitioner appeals from so much of a judgment of the Supreme Court, Nassau County (Franco, J.), entered July 10, 2002, as failed to annul that portion of the determination which found that the petitioner had misclassified two of its residents in the RUG-II special care group, failed to direct that the New York State Department of Health permit the petitioner to submit revised February 2001 patient review instruments for certain of its residents, and declared that the challenged guideline does not constitute a rule or regulation subject to the provisions of the State Administrative Procedure Act, and Antonia C. Novello and Richard Pellegrini cross-appeal from so much of the same judgment as annulled that portion of the determination which reclassified the two residents in the reduced physical functioning group and remitted the matter to

the New York State Department of Health to reclassify the two residents in the clinically complex group and to calculate the petitioner's Medicaid reimbursement rate for the period covered by its August 2000 patient review instruments accordingly.

Ordered that the judgment is affirmed, without costs or disbursements.

The petitioner is a not-for-profit corporation owned by the United Cerebral Palsy Association of Nassau County, Inc., which operates a 185-bed nursing home in Nassau County. The petitioner commenced this hybrid proceeding and action seeking, inter alia, to review the determination of Antonia C. Novello, as Commissioner of the New York State Department of Health and Richard Pellegrini, as Director of the Bureau of Financial Management and Information Support of the New York State Department of Health (hereinafter collectively the Commissioner) dated June 14, 2001, which reduced a component of the petitioner's Medicaid reimbursement rate following an audit. The reduction of the reimbursement was based on the adjustment by the Commissioner of the petitioner's case mix index (hereinafter CMI). The adjustment of the CMI was based on misclassifications revealed in an audit by the New York State Department of Health (hereinafter the DOH) of patient review instrument (hereinafter PRI) data used in computing the direct cost component of the petitioner's Medicaid reimbursement rate (*see* 10 NYCRR 86-2.10 [b] [1] [ii]). The petitioner challenges the finding of the DOH that it misclassified two residents as having a diagnosis of quadriplegia.

As part of the Medicaid reimbursement rate calculation, PRIs are completed semiannually for each patient in the nursing home (*see* 10 NYCRR 86-2.11 [b] [1]). PRIs require detailed information assessing patients' conditions, treatment, and dependencies and required care, needs, and services. These PRIs place patients into 16 patient classification categories or "resource utilization groups" (hereinafter RUG-II categories; *see* 10 NYCRR Appendix 13-A), corresponding roughly to the severity of the patients' medical conditions and the intensity of the required care. The RUG-II categories are further divided into five hierarchical groups which, in descending order of resource utilization, are heavy rehabilitation, special care, clinically complex, severe behavioral, and reduced physical functioning. Each RUG-II category is assigned a numerical value, which reflects the relative resource utilization of patients in that group. The CMI of a nursing home is the weighted average of its patients in each RUG-II category (*see* 10 NYCRR 86-2.10 [a] [5]). Thus, the greater the resource utilization, the greater the associated CMI, and therefore the greater the reimbursement.

The DOH publishes a clarification sheet to assist nursing homes in completing the PRIs. Question 30 of the PRI requires nursing homes to designate a diagnosis code reflecting the resident's primary medical condition requiring the largest amount of nursing time in the preceding four weeks (*see* 10 NYCRR 86-2.30 [i] [30]). In 1999, the DOH issued a revised clarification sheet in which it explained that a diagnosis code of quadriplegia "should not be used in instances where a resident has not incurred a spinal cord injury or spinal cord disease" (hereinafter the spinal cord etiology standard).

In August 2000 the petitioner submitted its PRI data to the DOH. In a subsequent audit, the DOH concluded that the petitioner had improperly designated a diagnosis code of quadriplegia on the PRIs for two residents, who suffer from cerebral palsy with spastic quadriplegia, because their quadriplegia was not caused by spinal cord injury or disease. As a result of the audit, DOH downgraded the two residents from the special care group to the reduced physical functioning group and reduced the petitioner's reimbursement rate accordingly.

The petitioner contends that in issuing the spinal cord etiology standard, the DOH changed its long-standing policy of reimbursing nursing homes at the same rate for all quadriplegic residents regardless of the etiology of their conditions and established a new "rule" without complying with the rule-making procedures outlined in the State Administrative Procedure Act. State Administrative Procedure Act § 102 (2) (b) (iv), however, specifically excludes from the definition of a rule "forms and instructions, interpretive statements and statements of general policy which in themselves have no legal effect but are merely explanatory." The spinal cord etiology standard sets forth the interpretation by the DOH of the particular medical condition that qualifies a resident for a quadriplegia diagnosis in response to question 30 of the PRI and, correspondingly, for classification in the special care group. As such, it is an explanatory statement and a technical instruction for meeting the regulatory requirement which has no legal effect standing alone (*see Matter of Elcor Health Servs. v Novello,* 100 NY2d 273, 279 [2003]; *National Assn. of Ind. Insurers v State of New York,* 207 AD2d 191 [1994], *affd* 89 NY2d 950 [1997]; *Leichter v Barber,* 120 AD2d 776, 777 [1986]). Moreover, even if it reflects a change in how the DOH interprets the prerequisites for a quadriplegia diagnosis, that does not render it an unpromulgated "rule" (*see Matter of HMI Mech. Sys. v McGowan,* 277 AD2d 657 [2000]).

The petitioner further contends that the spinal cord etiology standard is arbitrary and capricious, irrational, and contravenes

the design and purpose of the Medicaid reimbursement system requiring that reimbursement rates be "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities" (Public Health Law § 2807 [3]). Generally, rate-setting actions of the Commissioner, being quasi-legislative in nature, may not be "annulled except upon a compelling showing that the calculations from which [they] derived were unreasonable" (*Matter of Catholic Med. Ctr. of Brooklyn & Queens v Department of Health of State of N.Y.,* 48 NY2d 967, 968 [1979]; *see New York State Assn. of Counties v Axelrod,* 78 NY2d 158, 166 [1991]; *Matter of United Home for Aged Hebrews v Axelrod,* 201 AD2d 656 [1994]). Thus, "[a] petitioner attempting to challenge the reasonableness of [agency] rate-setting action bears the burden of demonstrating that the adopted methodology is without a rational basis" (*Matter of Sylcox v DeBuono,* 267 AD2d 850, 851 [1999] [internal quotation marks omitted]; *Matter of A. Holly Patterson SNF v Chassin,* 196 AD2d 155, 159 [1994]). The petitioner failed to meet its burden.

The petitioner maintains that there is no rational basis for excluding residents whose quadriplegia is not caused by a spinal cord etiology from the special care group because all quadriplegics, regardless of the etiology of their condition, require a high level of skilled nursing care. While not disputing that all quadriplegics require a high level of care, the Commissioner submitted an expert medical affidavit establishing that there are discrete medical and psychiatric conditions experienced by quadriplegics with spinal cord injury or disease requiring an associated increase in the level and intensity of care, treatment, and medications, as compared with quadriplegics with other etiologies. Reimbursing nursing homes at a lower rate for patients whose conditions, care needs, and resource utilization are less demanding is neither irrational nor inconsistent with the Medicaid reimbursement scheme, and the petitioner failed to demonstrate that the reduced reimbursement rate is unreasonable or inadequate to meet its costs (*see* Public Health Law § 2807 [3]; 10 NYCRR subpart 86-2; *Matter of Elcor Health Servs. v Novello,* 100 NY2d 273 [2003], *supra; Matter of Saint Mary's Hosp. for Children v Commissioner of New York State Dept. of Health,* 206 AD2d 486 [1994]). Contrary to the petitioner's contention, the doctrine of judicial estoppel does not bar the Commissioner from relying on the affidavit of their medical expert since the DOH did not secure a judgment in its favor in the unrelated proceeding brought in the Supreme Court, Albany County, nor is the Commissioner's position in this proceeding inconsistent with the position the DOH took in

that proceeding (*see Bono v Cucinella,* 298 AD2d 483 [2002]; *Ford Motor Credit Co. v Colonial Funding Corp.,* 215 AD2d 435 [1995]; *Environmental Concern v Larchwood Constr. Corp.,* 101 AD2d 591, 594 [1984]).

Finally, the Commissioner's determination to reclassify the two residents in the reduced physical functioning group based on the auditors' findings was arbitrary and capricious. Accordingly, the Supreme Court properly directed the Commissioner to reclassify the two residents in the appropriate RUG-II category and to correct the petitioner's CMI accordingly (*see* 10 NYCRR 86-2.30 [e] [5]). Florio, J.P., Friedmann, H. Miller and Mastro, JJ., concur.